## The People on the relation of Henry H. Le Roy and others v. Chauncey S. Hurlbut: Same v. William Barclay and others: Same v. John Owen and others.

*Legislative appointments of municipal officers.* The legislature had no power to make the appointment of the members of the board of public works of the city of Detroit, as permanent officers for the full term, or the specific portions of such terms, provided by the act establishing such board (*3 Sess. L. 1871, p. 273*), for the respective members thereof. Permanent appointments for purely municipal purposes can only be made by municipal authority.

Whether the appointment of such officers by the legislature, as was attempted by the act in question, can be sustained as provisional or initiatory only for the purpose of a primary organization of the board, and to put it in full operation :—*Quaere ?*

On this question the court was equally divided,—Christiancy and Cooley, JJ., holding the affirmative, and Campbell, Ch. J., and Graves, J., the negative.

*Questions discussed, but not decided.* The amendment of the charters of municipal corporations by the legislature of its own motion; the notice required for the introduction of a bill for that purpose; the construction to be given to § *16, Art. XV.*, of our constitution, and to *Comp. L.*, §§ *2168-2170*, in that regard; the effect upon the act establishing said board, of § *20, Art. IV.* of our constitution, relating to the object and title of statutes; the powers conferred by said act; the power to make by-laws; the question whether the appointment of the members of such board is an exercise of legislative or executive authority; the power of the legislature generally over local municipal affairs, and the effect upon the act in question, of the provisions therein requiring the members of said board to be selected "in equal numbers from the two political parties represented in the common council," discussed by Christiancy, J., with whom Cooley J., concurred, in holding the act valid.

This act and the police act, and this case and *People v. Mahaney, 13 Mich., 492,* distinguished by Campbell Ch. J.

The provision of the act concerning the partisan character of the board, discussed by Campbell Ch. J.

*Heard October 17, 18 and 19. Decided November 29.*

Informations in the nature of *quo warranto.*

These proceedings are brought to test the right of the members of the boards of water commissioners, and of sewer commissioners, of the city of Detroit, to continue to hold their respective offices after the taking effect of the act establishing a board of public works; and the questions raised, relate to the validity of said act.

*J. P. Whittemore, Lyman Cochrane, E. W. Meddaugh,* and *Theodore Romeyn,* for the respondent.

The act is invalid because it provided for the appointment of the first board of officers by the legislature.

1. The members of this board are officers within the meaning of *Art. XV., § 14* of the constitution.—*Underwood v. McDuffee, 15 Mich., 366 ; U. S. v. Hartwell, 6 Wall., 393.*

2. This section confines the power of the legislature to directing whether the officers other than judicial, shall be elected or appointed, and at what time, and in what manner, and it cannot be fairly construed as giving to the legislature the power of electing or appointing the officers by their own votes. The thing which we seek in the interpretation of a written instrument is *the thought which it expresses,* which we elucidate and determine in various ways. See *Cooley on Const., 57 ; People v. Blodgett, 13 Mich., 138, 142.*

To sustain our views we rely upon:—

(*a.*) *The natural signification of the words used.*

It is confidently submitted that the words used in this section, taken by themselves, imply no more than that the legislature may direct whether the officers shall be elected or appointed, and that they may direct the *time* and *manner* of election or appointment. This exhausts the meaning of the term "direct," unless authority to give direction for appointment *includes* power to make the

appointment. To direct, is properly a legislative act.—*13 Mich., 136.* When this direction is given the power is fully exercised, and is exhausted. To go on and make the appointment or election is a distinct and additional matter.

And this is an act of an executive character (which, as we shall hereafter show, the legislature may not exercise, except where expressly authorized).—*People v. Blodgett, 13 Mich., 136 ; Att'y Gen. v. Kennon, 7 Ohio St., 561, 566 ; Taylor v. Commonwealth, 3 J. J. Marshall, 404.*

Farther: *Judicial* officers of cities *must* be elected under the constitution. This must be understood to be by the electors *residing in the municipality* or district.—*Const., Art. VIII. ; People v. Blodgett, 13 Mich., 136 ; Cooley on Const., 600.*

Now, demonstrably, the grant of power to the legislature to direct whether the other officers shall be elected or appointed, cannot be interpreted to mean that the legislature may constitute themselves electors, if they direct that the choice shall be by *election.* On what principle of fair construction can this grant give power to make themselves the appointers, if they direct the latter mode of selection?

(*b.*) *An examination of the whole instrument.*

The whole is to be examined with a view to arriving at the true intention of each part.—*Cooley on Const., 57, 58.* See *Const., Art. III.,* for division of powers of government into legislative, executive, and judicial, and inhibiting one department from exercising powers properly belonging to another, except in cases expressly provided for in the constitution. See *Const., Art. IV.,* §§ *9, 11, 37 ; Art. VI.,* providing for election of judges. See §§ *7, 10, 14, 16 ; Art. VIII.,* §§ *3, 5 ; Art. X.,* §§ *3, 7, 8 ; Art. XII.,* §§ *5, 7, 8 ; Art. XIII.,* Education ; *Sess. L. 1863, p. 453.*

We find in these provisions a positive inhibition on the legislature against the exercise of executive powers; and

especially in relation to elections, or appointment of officers, other than their own, even to fill vacancies.    Looking at these and other specific provisions, and at the general scope and spirit of the constitution, can we believe that it was intended to leave with the legislature the power of appointing by their own votes any or all municipal officers, other than judicial?   See *Cooley on Const.*, *189*, *190*.

(*c.*) *The history of this constitutional provision, and the proceedings in the convention,* show clearly that it was not the intention of the framers of the constitution to leave with the legislature the power of appointing any municipal officer by their own votes.    As to the force of this consideration, see *Cooley on Const.*, *p. 66 ; 13 Mich.*, *165.*

In the proceedings of the convention of 1850, we find the following:  See *Debates of the Convention, pp. 7–35;* for appointment of committee on phraseology and arrangement, and reference of articles to such committee.    See *Rule 39.* Next, as to power of this committee, see *Ibid., pp. 797, 798.* For reference of subjects to standing committees, see *Ibid., p. 18.*    There were two committees who separately had charge of the subjects "of the organization of the government of cities, and villages," and "of banking and other corporations, not municipal."    Both these subjects were blended in one article (fifteen) by the committee of arrangement, after having been discussed and adopted separately by the convention.—*Report of the Article, p. 326.* The article was entitled " Of cities and villages," and was reported as follows :

" SECTION 2.    All judicial officers of cities and villages, shall be elected at such time and in such manner as the legislature may direct.    All other officers of such cities and villages, shall be elected by the electors thereof, or appointed by such authorities thereof, as the legislature shall designate for that purpose."

On page 594, we find the debate on the article. The convention refused to amend this section. On page 596, we find that the article was then ordered to be engrossed for a third reading, without amendment.

Thus, then, we see in what sense the convention adopted this article. In the *Journal, p. 312,* we find the reference of it to the committee on arrangement and phraseology. The report of this last committee is on page 904, of the debates. See also, *pp. 881–887–889.* It will be seen that the article as last reported, was simply:

"SECTION 14. Officers of cities and villages shall be *elected* at such times and in such manner as the legislature may direct."

Here the "thought meant to be expressed" cannot be mistaken. The committee changed the original article as it had been adopted by the convention, by providing that all officers should be *elected*, and none appointed. In this view of the case, they dropped the words "by the electors thereof," because as we have seen, no other electors could vote. In order to preserve the principle of *appointment* in such cases as the legislature might think required it, amendments were offered by Governor McClelland, as follows:

"On motion of Mr. McClelland, section fourteen was amended by inserting the word 'judicial' at the commencement of the section, and the words 'and all other officers shall be elected or appointed,' after 'elected,' in the first line of the section."

This was the extent of the amendment according to the force and import of the words, and of the report of the committee, in view of their powers as a committee on phraseology and arrangement.

Under these circumstances, and in view of the scope and spirit of the constitution, is it possible to suppose that the convention, by adopting these amendments, intended to

so change the article for elections as originally reported and adopted, as to give power to the legislature to appoint municipal officers in their discretion—for life or other term (for such is the extent of the power)—and to deprive the people of any locality on which a charter might be forced, of the power to choose their own officers?

Further: Why provide that *judicial* officers should be elected by the local votes, and leave executive officers to be arbitrarily designated by the legislature? All reasons of policy are in favor of a reversed course, if there is to be any distinction.

Is it not plain that the convention meant no more than to give the legislature the right to direct the mode and time of choosing officers other than judicial, so as to save the necessity of having an election for every petty ministerial officer, but at the same time to leave the power of selection with the electors or authorities of the municipality?

(*d.*) We contend, further, that the language of the constitution should not be construed so as to leave with the legislature the power to appoint municipal officers, in view of the *consequences* of such construction.

This is a legitimate rule of construction.—*Story on the Const.*, § *400*. This rule will always be observed, unless the words used are entirely explicit.

What is involved in the claim of legislative right to make these appointments? Clearly they may select particular municipalities. They may appoint all officers not judicial. They may appoint for life, and also provide for succession in office. They may govern by commissions, and with what probable results is now intelligible by the experience of our chief city.

We insist that the natural meaning of the words used, the general provisions of the constitution in other places, and viewed as a whole,—the history of the enactment in

24 MICH.—7.

question,—the consequences of a construction which shall confirm the claim of the legislature, and substitute its power for that of the electors or authorities of the local municipal district,—all proclaim the invalidity of this law. It destroys the spirit of the constitution. It is cruel and oppressive to the citizens, and corrupting to the legislature.

In the words of another:

"The power of local appointments and administration cannot constitutionally exist in the electors and authorities of cities and towns, and in the central authority at the same time. The one power is, of necessity, in exclusion of the other. And this court must either construe the constitution so that local rights and privileges expressly mentioned, and never until now questioned, shall remain to be exercised and enjoyed by the local communities, or sanction a construction which may, and indeed can hardly fail to exclude them altogether."

*Samuel T. Douglass,* and *George V. N. Lothrop,* for the relators.

The enactment in the first section of the public works act, that the defendants shall be members of the board of public works, was a valid appointment of them to the offices designated.

1. It was an *appointment,* and not an election.—*Sturgis v. Spafford, 52 Barb., 436.*

2. We can see nothing objectionable in the manner in which this appointment was made, if we assume that the legislature had power to make it.

3. The appointment was not unconstitutional, because in violation of a maxim of republican government that local concerns shall be managed in local districts, the electors of which shall choose their own administrative officers. —*Cooley on Const. Lim., 170, and note 3.*

4. Nor is it unconstitutional because not an exercise of legislative power. It is not easy to define the exact limit of legislative power.—*Cooley Const. Lim.*, *87, 88, 89, 114 et seq.* And it is not necessary for our present purposes, for the uniform practical construction of our American constitutions. has been that the legislature had the power to make such appointments, unless expressly or impliedly inhibited from making them.

The first water commissioners, police commissioners, and fire commissioners of Detroit were appointed in the same way (*Charter*, *pp. 197, 194, 248*.) The invalidity of legislative appointments on the ground here alluded to, has never been claimed.—*People v. Mahaney, 13 Mich., 481; People v. Bennett, 54 Barb., 480.*

5. *Art. XV.*, § *14*, of the constitution does not impliedly inhibit the appointment by the legislature of city officers, not judicial. By the provision that all other officers shall be elected or appointed at such time and in such manner as the legislature may direct, it is implied that the legislature may appoint them if it sees fit. The unrestricted power in the legislature to prescribe the time and manner, and of course by whom an appointment may be made, includes *ex vi termini* the power to make it.—*People v. Mahaney, 13 Mich., 481; People v. Bennett, 54 Barb., 480.*

*J. Logan Chipman*, on the same side.

1. The objection that the legislature have no power to appoint the relators in the manner they did, is made rather late in the history of the constitution of this state.—*Const. Art.* XV., § *14*.

That instrument has been in force a period of twenty years, and from the time of its adoption to the present day the legislature have exercised the power.

THE PEOPLE *v.* HURLBUT.

In 1853 they exercised it in the case of the water commissioners.—*Rev. Char.,* 179.

In 1857, in the case of large classes of officers of the city government.—*Rev. Char.,* (*1857*), 32.

In 1861, in case of the house correction.—*Ibid.,* 235.

In 1865, in the case of the police commissioners of the city of Detroit.—*Sess. L. 1865, p. 99.*

Again, in the case of the police commissioners in 1871, and in the case of the park commissioners in the same year.

In 1867, in case of the fire department.—*Rev. Char.,* 268.

Thus, in the city of Detroit alone, the legislature has exercised this power continually during seventeen of the twenty years of the existence of the constitution, beginning with the water act, and ending with the public works, park commission, and police acts of last winter.

2. This power, then, has been exercised unquestioned during all these years. Rights have accrued under it, and one board, at least, appointed under it, has been declared constitutional by the supreme court.—*People v. Mahaney, 13 Mich.* To-day in the city of Detroit, three commissioners, (fire, park, police,) are unconstitutional, if the power is improperly exercised.

But it is not unconstitutional. Is not the act of appointment by the legislature a direction as to the time and manner under the constitution? Is appointment to office necessarily beyond the legislative power?

CHRISTIANCY, J.

We now proceed to dispose of the cases of *quo warranto* against the members of the board of water commissioners, and those of the board of sewer commissioners, of the city

of Detroit. The members of these boards are called upon to show by what authority they claim and continue to hold and exercise their offices, after the act "To establish a board of public works in and for the city of Detroit" had taken effect on the first Monday of August, 1871, and after the members of this new board had taken the oath of office and qualified.

The respondents, members of the old boards, insist, *first,* that the act creating this "board of public works" was passed without the notice required by the constitution and the statute enacted to carry its provisions into effect; and, *second,* that even if the notice was sufficient, the provisions of the act are repugnant to, and in violation of, the constitution of the state in several important particulars.

We will first dispose of the question of notice. The only notice actually given was this: Mr. McGonegal, a member of the house, on the 15th day of February, 1871, gave notice in writing, in the usual way, that on some future day he would ask leave to introduce "a bill to provide for a board of public works in the city of Detroit;" and on the 17th the bill, on leave granted, was introduced by this title (see *Journal, pp. 403, 471).* This was in accordance with a rule of the house requiring one day's notice of the introduction, or of motion for leave to introduce, a bill, except when introduced on report of a committee.

The constitution (§ *16, Art. XV.)* declares that "previous notice of any application for an alteration of the charter of any corporation shall be given in such manner as may be prescribed by law."

It is quite manifest, from the nature of this provision and of the subject matter to which it relates, that its main purpose was to prevent applications being made to the legislature for amendments of corporation charters, by the corporation itself or interested parties, in such manner as to avoid public

scrutiny and discussion, or a fair hearing of any remonstrances against the proposed alteration or amendment. It was designed to prevent imposition upon the legislature and the public, and not to restrain the legislature from making, of its own motion, such amendments or alterations in the charters of municipal corporations, at least (which are a part of the government of the state), as in their opinion the public interests might require. It goes upon the presumption that the legislature, itself, will be honestly disposed to protect the public interests, but that it may be misinformed or imposed upon by interested and designing parties, looking to their own, rather than to the public interest.

It was with this view of the constitutional provision that the act of April 7, 1851 (*Comp. L.*, §§ *2168 to 2170*) was passed, requiring thirty days' notice, by publication, of an *application* for the amendment of a corporation charter, when such application is made on behalf of the corporation or by one or more individuals, except in certain specified cases, but expressly providing (§ *3, of the act*) that this act shall not "prevent the legislature, without such notice, from amending any charter of a municipal corporation in any particular which they may deem necessary for the public interest;" and that in such case "one day's previous notice in either house, by a member thereof, shall be sufficient."

The effect of this act and of the constitutional provision under which it was framed, would be to justify the legislature in disregarding, and probably—while the act remains in force—to impose upon them the duty to disregard the *application* as such, until the proper notice should have been given as provided by the act. It does not, however, operate to restrict the right of the legislature itself to make such amendment as they may think the public interest may require; nor does it restrict the right of any member of either house of introducing a bill for that purpose on giv-

ing one day's previous notice of his intention so to do. Nor do we think, as insisted by the counsel for the respondents, that the notice, when given in either house by a member, is by this act required, as in case of an "*application*" in behalf of the corporation or individuals "to set forth briefly the nature of the alteration *applied for.*" This provision applies only to cases where alterations are *"applied* for" from *without* the legislature itself, and is co-extensive *only* with the provision requiring the publication of the notice of such application. The provision allowing a member of either house to give one day's notice of the intention to introduce a bill for such purpose was, we think, intended to recognize the almost universal custom or practice in legislative bodies in this country, to require one or more days' notice from a member, of his intention to introduce, or ask leave to introduce, a bill; in which case nothing more than the title or general object of the bill is usually required.

It is urged that if this be the true construction of the constitution and the act, both may be readily evaded; as it would always be practicable for the corporation to procure some member of the house or senate to give the one day's notice, and to introduce the bill on his own responsibility as a member. This may or may not be true; but if true, it is a difficulty inherent in the nature of the subject itself, and for which the courts cannot provide a remedy. A proper respect for a co-ordinate branch of the government requires us to presume that each member of the legislature acts upon his individual convictions of public duty, and that he will not become the willing instrument of designing parties, to enable them to evade the statute or the constitution.

The next objection is that the act is void under § *20, Art. IV.,* of the constitution, which provides: "No law shall

embrace more than one object, which shall be expressed in its title."

This act, it is true, transfers to this board of public works all the powers, duties, and responsibilities of the old "board of water commissioners," the "board of sewer commissioners," and of the "commissioners of grades and plans," and vests them with the books, papers, and property formerly held by them. It gives the board the charge and control of the erection and construction of engine-houses, city hall, and all other public buildings (except schoolhouses), public sewers, drains, water-works, hydrants, pipes, and reservoirs in the city, requiring the former boards to transfer to this board, the books, papers, maps, records, moneys, assets, and property belonging to said boards respectively; gives this board the charge and control of the streets, public parks and grounds.

All the other powers conferred upon the board, and all the other provisions of the act, so far as material to inquire upon the point we are now considering, whether constitutional or not in other respects, are at least calculated to enable the board to carry the above powers into effect, and appropriate to that end. It vests in the board, as a corporation, and for the public purposes of the city, all the property previously vested in the several boards named, nearly all of which consisted in the water-works and the land and appurtenances connected therewith. It authorizes the board, for the purpose of obtaining any property which may be required for the purpose of the act, to take proceedings to condemn the same by the right of eminent domain, and vests the title of such property, when condemned, or obtained by agreement, in the board for the public purposes mentioned in the act. It authorizes the board to contract for the performance of the various works

confided to their charge, to employ overseers and workmen, to propose a plan for sewerage for the whole city, to draw upon the proper funds for payment of expenses; gives them power to make by-laws for the regulation and control of the various public works under their charge; gives power to issue bonds in certain cases, to obtain means for carrying on any of said works, etc., and proceeds to regulate with some particularity the mode in which the various powers given are to be exercised.

All these provisions are in their nature fairly adapted to accomplish the end or object indicated by the title, "to establish a board of public works in and for the city of Detroit," and must be held to come fairly within the object stated in the title, unless we are to hold that, under this constitutional provision, an "act to *establish*" such a board must be confined to the mere creation of a board, *without duties or powers* (which would be nonsense), and that, not only a separate act would be required to prescribe such duties and powers, but a separate act for *each duty* and *power* conferred, and another for abolishing each of the old boards; for it must be remembered that "no act is to embrace more than *one object*, which shall be expressed in its title." But it is quite clear and well settled that nothing more than the *general* object need be stated in the title, and that every provision, which is fairly calculated to carry that object into effect, must be held to come within it. This was so well and clearly shown by my brother Cooley in *People v. Mahaney, 13 Mich., 495, 496,* and the facts of that case are so entirely applicable to this case upon this point as to render it wholly unnecessary further to discuss it.

There are two provisions, however, in this act upon which a doubt might perhaps be entertained whether they come within the above reasoning, or within the title to the

24 mich.—8

act: *First,* the provisions in sections nineteen and twenty, making it a misdemeanor for any person, wilfully to injure any of the public works or property, or to pollute the waters. It might, perhaps, be said that the title of the act is not such as to give any intimation that a part of its object was to define crimes or misdemeanors, or to provide for their punishment; and *second,* the provision in section twenty-one, giving power to extend distributing pipes, mains and sewers, to establish grades and construct reservoirs, hydrants, etc., without the limits of the city adjacent thereto, etc., and to regulate and control such works, as if within the city.

But it is quite unnecessary to determine whether these provisions come fairly within the title, since these are in no way essential to the exercise of any of the powers and duties vested in the board by the act, and all the other provisions of the act would remain in full force and efficiency without them; and if not within the title, the only result would be that these particular provisions would be held void, without impairing the rest of the act. And it is time enough to raise the question, upon these particular provisions, when a criminal prosecution shall be attempted under the nineteenth and twentieth sections, or when the board shall undertake to exercise the powers given by the twenty-first section, out of the city. See *People v. Mahaney, 13, Mich., 499, citing Smith v. Village of Adrian, 1 Mich., 495; Ames v. Port Huron Log-Driving and Booming Co., 6 Mich., 266, and Parsons v. Russell, 11 Mich., 113.*

We cannot, therefore, treat this act as void in the present proceeding, on the ground that it embraces more than one object, or that the object is not expressed in the title.

The next objection is that the act is void because the officers or members of the board are appointed by the legislature, and in the act itself.

*Section 14, Art. XV.,* of the constitution provides: " Judicial officers of cities and villages shall be elected, and all other officers shall be elected or appointed at such time and in such manner as the legislature shall direct."

There can be no reason to doubt that the members of this board are "officers" within the meaning of this section, though not officers required or designated by name in the constitution itself.

The constitution does not seem to have made any clear distinction between the "election" and the "*appointment*" of officers; and in § *18, Art. IV.,* the terms seem to be used as synonymous—and what is usually and more properly termed the "*election*" of a senator, is there designated as an "appointment;" but in § *14, Art. XV.,* above quoted, a distinction seems to have been recognized, though not defined. And though, when the legislature in joint convention proceed directly to vote for officers under the provisions of the constitution, or of any law for that purpose, this mode of selecting the officer might properly be called an election; yet when, as in this case, the selection consists not in voting directly for the persons who are to fill the offices, but in filling the blanks in a bill, in the course of its passage through the respective houses, with the names of the persons who are declared to be such officers, it must, I think, be conceded that this is more in the nature of an appointment than of an election. The vote is taken in the same manner as in filling any other blank in the bill. It should, therefore, I think, be treated as an appointment, and not as an election. There is nothing in the constitution expressly authorizing the legislature to make such an appointment of these officers (nor to elect them, if it be held to be an election). And the first and most general objection to the act is, that this mode of

appointing or selecting the officers named in the act is not an exercise of *legislative,* but of *executive* power; that legislative power is, in its nature and essence, the power of *prescribing rules* of action, or regulations for the government of officers, of public boards, of courts and of individuals—and not of selecting particular individuals by name, deciding upon their respective merits or rights, or making special enactments in reference to individuals, not in the nature of rules, or regulations; that to direct the time and mode in which an appointment shall be made, and by whom, is an exercise of legislative power; but that the making of such appointment, in pursuance of such direction, is essentially the exercise of a power in its nature executive. The effect of this position, if correct, would be to render the appointment in the present case void, whether § *14, Art. XV.,* forbids it or not; since, if the legislature have the power, it is in virtue of the grant of legislative powers given them by the constitution; and we shall, therefore, dispose of this question before proceeding to discuss the effect of § *14,* above alluded to.

This view of the nature of legislative power, as urged by the counsel for the respondents, struck me at first with considerable force; but reflection and further examination have satified me that, though true as to the great mass of legislative power—that which is most broadly distinguished from both judicial and executive—yet it does not include the whole field of what is generally recognized as legislative power, not only in England, but in most of the states of the union. Besides the power to make general rules for the government of officers and persons, and regulating the rights of classes of persons, or of the whole community, there is a large class of powers recognized as legislative, occupying an intermediate space between those general rules and regu-

lations, and those of a judicial character on the one side, and executive on the other, and which are not, and cannot be, marked off from these by any clear and palpable line.

Thus, in our own state, no one has ever doubted the validity of laws so frequently passed, to change the name of any person (at his own request), though the act affects only the individual; and the same may be said of many other private acts, and acts affecting only an individual or a particular case, which the legislature, under our own constitution, still have the power to pass, notwithstanding the prohibition against authorizing the sale or conveyance of real estate, against vacating certain roads or streets, or granting divorces. But for such prohibition the legislature would, doubtless, in many cases, possess the power (as a part of the grant of legislative power), to pass special laws authorizing the sale of real estate by guardians, trustees or persons standing in fiduciary relations to others who are incapable of acting; and so of statutes validating proceedings in particular cases. See numerous cases of this kind collected, and the principle fairly stated, in my brother Cooley's work on *Const. Lim., 96* to *107*. But they cannot decide contested or conflicting rights or claims between individuals; nor, as I think, decide upon and apportion by their own act the respective amounts which individuals shall contribute toward a tax or public burden.

There are numerous cases, also, in which the legislature, as the representative of the public rights and interests, may, and very frequently does, pass acts in favor of a particular individual,—such as the right to establish a ferry; to build a dam across a navigable stream; requiring the issuing of a new warrant for locating lands, in place of another which has been lost; requiring the commissioner of the land office to sell certain school lands to a particular person for a certain specified price; to restore to a particular person, by

name, his right which has become forfeited in certain specified school lands; authorizing the governor to issue a patent for a particular tract of land to a person named, etc. Such acts are very numerous, and scattered through our statutes from the first organization of the state government, and the same is true of other states.

So the legislature may *directly* exercise the power of vacating or discontinuing a state road or any part of it.— *People v. Supervisors of Ingham Co., 20 Mich., 95.* They may appoint agents by name to take charge of, or protect or manage, any of the public property, or any particular department of the public interests, not by the constitution confided to any other specified officer or agency. Thus, they may, and frequently do, appoint certain commissioners by name to locate a county seat, to lay out state roads, to expend non-resident highway taxes in certain townships upon a certain road, and to improve and construct roads. Great numbers of such acts have been passed, and I think there has been no regular session under the present constitution without more or less of them. And since it has become the policy of the state to appropriate swamp lands to the purpose of constructing roads, the acts' have been very numerous appointing commissioners by name for the purpose of constructing, or contracting for the construction of, such roads; and, though there has been little uniformity in the acts, it would be very difficult to maintain any distinction between these commissioners and other public officers, or to make them mere agents instead of officers. Many of the state-road acts, and those appropriating non-resident highway taxes to certain roads, and appointing commissioners for their construction, and many of the swamp-land-road acts, require the commissioners to take the official oath and to give bonds; and they are expressly styled "officers;" and in some cases the acts prescribe

expressly their terms of office,. and provide for filling vacancies, as in case of other public offices.—*Sess. L. 1853, pp. 121, 122 ; Sess. L. 1863, p. 320 ; Sess. L. 1857, pp. 382, 474 ; Sess. L. 1859, pp. 46, 110 ; Sess. L. 1855, p. 135.*. Such commissioners are, I think, public officers within the meaning of the constitution. And as the legislature represents the public interest, and has full control of all municipal organizations, as instrumentalities of government, I see no reason to doubt their power of creating such offices as they may think the public interest requires, or of filling them with such persons as they choose to designate in the act, except as that power is restrained by some provision of the constitution. This course of legislation may not be wise or politic; but as a question of power, I think the legislature possesses it, with the limitations above mentioned.

As to this mode of appointment being the exercise of a power essentially executive in its nature, it is sufficient to say that executive power cannot always be defined by any fixed standard, in the abstract. What would come within the executive power in our form of government, would fall within the legislative in another, and *vice versa.* The question here is, whether, under our constitution, it is executive or legislative; and as the constitution has not confided the appointment of these or the like officers to the executive authorities, and has left it to the legislative discretion whether to create such offices, and how they shall be filled, it cannot be truly said that such an appointment is any more in the nature of the exercise of an executive than of a legislative power.

The next objection to the validity of the act is, that the power of the legislature (under § *14, Art. XV.*), is confined to directing whether officers other than judicial, in cities and villages, shall be elected or appointed, and at what time and in what manner the election or appointment shall be

made; that in thus *directing*, their power is exhausted, and they cannot make the appointment themselves.

This argument is not based upon the ground that the provisions of this section were intended to confine the power of making the appointment to the common council of the city or to any other local authority for which only it was intended the legislature should provide; but it goes upon the assumption that, even admitting the power of the legislature to provide for an appointment otherwise than by the local authorities of the city, still the legislature could not itself make the appointment in the manner they have undertaken by this act to make it; their power being limited to directing the time and manner in which it should be made.

Though this argument may seem plausible, I do not think the conclusion is so clear or free from doubt as to authorize us to declare the act void on this ground. If the legislature had the power to provide the time and manner of the appointment, and were not confined to providing for the appointment by the local authorities, then they had the power to provide that it should be made by the governor with or without the consent of the senate, or by the legislature in joint convention, or finally, by the legislature in the very form and manner which was adopted. And if they had the power to direct that it should be made in this way, it would be very difficult to give any substantial reason why they could not proceed to make the appointment as they did, without first passing an act providing that it should be so made. Such an act would be but a legislative determination that the appointments should be so made; and the actual making of it in this way shows the like legislative determination. A similar exercise of power by the legislature has been upheld by the supreme court of New York.—*People v. Bennett, 54 Barb., 480.*

But it is further insisted by the counsel for the respondents, that the intention of this provision of the constitution was, and its fair and natural meaning is, that judicial officers of cities and villages shall be elected by the *electors of such cities and villages* at such time and in such manner as the legislature may direct, and that all other officers of such cities and villages shall be elected by the electors thereof, or appointed by such authorities thereof, at such time and in such manner as the legislature shall direct. And such, I confess, is the inference of intention which I draw from the provision and the *subject matters* to which it relates. It is, however, true, that it is but an inference. By no mere interpretation of the words used can the power here given be limited to elections by the electors of the city or village, or the appointment to any local authority. The words are general and unlimited in this respect, and the limitation can only be implied or inferred from the nature of the subject matter to which they relate; yet in respect to the election, the inference is very strong and satisfactory, that it was intended to be only an election by the electors of the locality. This accords with the meaning of the term as generally used in the constitution, in reference not only to the state at large, but in reference to the local organization of counties, towns and districts; and cities and villages being local organizations for like governmental purposes, it is difficult, if not impossible, to resist the conclusion that when this section (§ *14, Art. XV.*) of the constitution declares that "judicial officers of cities and villages shall be elected," an election by the electors of such localities was intended; as this was precisely the principle adopted by the constitution in reference to all other judicial officers; and there is no reasonable ground for saying that the election of other officers mentioned in the immediate context was to be of a different character. And it may be

24 MICH.—9.

said with certainty that, wherever, in the constitution, the election of an officer is provided for, it means an election by the electors, of the state, if it be a state office, or of the district or political division for which he is to be elected, unless the constitution itself, as to any particular election, provides otherwise.

The inference that the appointments referred to in this provision were intended to be such only as the legislature might authorize the local authorities to make, may not be so palpable at first view, as there is no provision how appointments in general shall be made; and all that are authorized to be made of a local character are not required to be made by the local authorities of the district or locality for which the appointment is to be made.

But when we recur to the history of the country, and consider the nature of our institutions, and of the government provided for by this constitution, the vital importance which in all the states has so long been attached to local municipal governments by the people of such localities, and their rights of self-government, as well as the general sentiment of hostility to everything in the nature of control by a distant central power in the mere administration of such local affairs, and ask ourselves the question, whether it was probably the intention of the convention in framing, or the people in adopting, the constitution, to vest in the legislature the appointment of all local officers, or to authorize them to vest it elsewhere than in some of the authorities of such municipalities, and to be exercised without the consent, and even in defiance of the wishes of the proper officers who would be accountable rather to the central power than to the people over whose interests they are to preside,—thus depriving the people of such localities of the most essential benefits of self-government enjoyed by other political divisions of the state—when we take all these

matters into consideration, the conclusion becomes very strong that nothing of this kind could have been intended by the provision. And this conviction becomes stronger when we consider the fact that this constitution went far in advance of the old one, in giving power to the people which had formerly been exercised by the executive, and in vesting, or authorizing the legislature to vest, in municipal organizations a further power of local legislation than had before been given to them. We cannot, therefore, suppose it was intended to deprive cities and villages of the like benefit of the principle of local self-government enjoyed by other political divisions of the state.

The convention must be supposed to have recognized to some extent existing things, and to have had reference to cities and villages with substantially such organizations, or upon such principles of self-government as had generally become customary. And in this view, when they provide that officers in cities and villages should be elected or appointed, we must understand that they referred to appointments of such nature (though not necessarily of the same officers) as had been sometimes, at least, made by the common councils of cities, or by village authorities, as had been quite generally the case with marshals, collectors, city attorneys, treasurers, etc., and such others as the legislature might see fit to vest in such council or some other local boards, and resting upon similar principles.

While, therefore, I have no doubt of the power of the legislature to abolish or discontinue any of the separate boards previously existing in the city, and to consolidate all their powers and duties in this new board, which I think was the main purpose of this act, and to add all the new duties that have been imposed upon them, I concur in the opinions of the Chief Justice and my brother Cooley,

that the legislature had no power to make the appointment of the members of that board, as permanent officers for the full term, or the specific portions of such terms provided by this act for the respective members of the board. And to their full and exhaustive discussion of this point I refer without repeating it.

But I do not on this account consider the act void, nor these appointments as wholly without effect. Previous to the present constitution, which forbids the creation of corporations other than municipal except by general law, it was quite usual to incorporate by name certain persons and their successors; and municipal corporations may still be created by special acts. These officers and their successors are incorporated by this act. And their appointment may, I think, be treated as provisional, or initiatory only, for the purpose of a primary organization of the board, and to put it in full operation. Though the appointment for the full, or a definite portion of the full, term cannot be sustained, it is void only as to that portion of the time to occur after the organization is complete and the board are put in full possession of their offices, power, and franchises. The act does not seek to retain the appointing power in the legislature, but vests all future appointments in the common council; and in effect evinces the intention so to vest it whenever the authority of the legislative appointments made by the act should cease to be effectual. If they misjudged as to the period for which the appointment would be thus effectual, and undertook to continue it further, it does not render it void for the period during which they had the right to make it effectual; in other words, till the board should be fully organized and in full possession of its functions. It is void only for the period beyond this; and from the time the board shall be duly

organized and put in full possession of its powers and franchises, its provisional character ceases, and the power of appointment vests in the council.

The next objection urged to the constitutional validity of the act, is that it vests in this board of public works, legislative powers: *First*, in the power given to make by-laws, rules, and regulations; and *second*, in other particulars which will be noticed as we proceed; and it is urged that this is in violation of § *38*, *Art. IV.*, of the constitution, which, it is claimed, only authorizes such legislative powers to be granted to the *corporation of the city itself.* The section is in these words: " The legislature may confer upon organized townships, incorporated cities and villages, and upon the board of supervisors of the several counties, such powers of a local, legislative, and administrative character, as they may deem proper." And it is insisted that these powers can only be conferred upon the *city corporation*, to be *exercised* by the *common council*, and that no part of them can be conferred upon this or any other board of the city.

But the common council of the city is not the city, nor the legal entity known as the corporation of the city. It is, itself, but a public board for municipal governmental purposes, with just such powers (not forbidden by the constitution) as the legislature have thought, or may hereafter think, proper to confer. Yet no one doubts that the legislature might confer upon it all the powers mentioned in the section of the constitution above cited, and the counsel for the respondents seems to claim that it is proper to confer such powers, in cities, *only* upon the common council. But as there is nothing in the constitution requiring cities to be governed by a common council, or that any board by that name, or with the same powers, should exist; and the proper organization of such municipal government is left to the discretion of

the legislature, with the limitation already indicated, I can see no reason to doubt their power to abolish it, and to substitute any other board or municipal agency in its place, not inconsistent with the constitution. And I can discover no reason why the powers heretofore exercised, co-extensive with the city limits, by the common council, may not be parceled out to several different public boards, giving to one the supervision and control of one class of subjects pertaining to the public interest, and to another, another class. Each board would clearly constitute a part of the city government for public and municipal purposes; and I think the several "local, legislative, and administrative powers" mentioned in this section, properly pertaining to the several classes of subjects committed to the several boards, may be just as properly conferred upon the appropriate boards respectively, as upon the common council; and that it is just as clearly conferring such powers upon the corporation, within the meaning of the constitution.

As to the power of making by-laws, and rules and regulations (which are the same thing), expressly given by the act in reference to the various public works committed to the charge of the board, I see no objection whatever. This board is a corporation, and the power to make by-laws is implied in every act of incorporation (unless the charter otherwise provides), as an incident of its existence. It is a means of carrying out the powers conferred and for the accomplishment of the purposes of the act, and whether implied, or the general power to make them be expressly given without express limitations, the power must be thus limited in all cases by implication; and the general grant of the power to make by-laws, or to make them upon certain subjects, is always subject to the further implied limitation that they shall not be repugnant to the charter, nor

to the constitution of the United States, nor to the constitution or the laws of the state; and that they must be reasonable.

The power given in the fourth section "to make by-laws and rules, and to do all legal acts which may be necessary and proper to carry into effect the intent and objects of this act," and the same power repeated in the twenty-sixth section is clearly such power only as would have been implied, if not expressly given. That in the fifth section, to make printed rules and orders regulating the use of the streets, parks, and public grounds, is also, I think, of the same character, and would have resulted from the charge and control of the same, given to the board by the same section. No charge or control of these public works could be rendered effectual to any purpose without some power of making and enforcing rules or regulations for that purpose. No supervision or control of any business, whether by an individual, by officers or by a corporation, can be made effectual without some order or system; in other words, without the observance of some rules and regulations, and such is the nature of the by-laws, which, by these sections, the board is authorized to make. The power to make such by-laws is rather in the nature of what the constitution denominates "administrative," than legislative powers; and all the several acts creating the several boards whose powers are transferred to this board of public works, give the like powers to make by-laws, rules, and regulations, and so of the acts creating the board of police commissioners, and the fire commissioners; yet no fault seems to have been found with *this power* granted by *those acts*.

The fact that this corporation or these officers may make, or rather attempt to make, certain rules or by-laws which may exceed their power, and which would therefore be void, is no sufficient reason, in a proceeding like the

present, for declaring the act void, because the officers have the physical power to violate its provisions by enacting by-laws in excess of the powers given them, and which would be void for such excess. If this were so, no valid act of incorporation could ever be passed.

Doubtless the legislature may expressly, or by necessary implication, confer upon municipal corporations, under § *38*, *Art. IV.*, the power to pass by-laws more in the nature of legislative provisions, and involving to some extent, what would be properly legislative power, but for local and municipal purposes,—by-laws, the power to pass which would not be implied from the power of supervision and control over a particular subject or public work, and which might be in contravention of the laws of the state elsewhere in force.—*Cooley's Const. Lim.*, *198*, *199*. Such may be the nature of the power given to the board by the eleventh section in reference to the collection of water-rates.

But, as this is a power which it is not denied might have been conferred upon the common council, and the other powers to which objection is made, as contained in sections nine and thirty-five, are such as might have been conferred upon the common council, I do not deem it necessary to notice them further; since in my view, as already explained, it was competent for the legislature to confer upon this board all the powers of a " local, legislative or administrative character," touching the matters placed under their administration and control, which it would have been competent to vest in the common council.

As to the power of extending water-pipes, sewers, etc., beyond the city limits, given by the twenty-first section, I see no constitutional objection to it; but it is wholly unnecessary to discuss this point, since, if entirely invalid, it in no respect impairs the general operation and effect of the act. And here I may remark generally, that in this

proceeding by *quo warranto*, it would not be sufficient for respondents to show that some particular provision of the act gives a power not warranted by the constitution. It must be shown to be void in so many or such important particulars, that the main general purposes could not be carried into effect without the aid of these objectionable provisions; or that they are such as fully satisfy the court that, without the provisions in question, the legislature would not have passed the act. It is time enough to decide upon any mere excess of constitutional power given to the board by any particular provision, not necessarily affecting the whole act, when the board shall attempt the exercise of such power, which we are not to presume, in advance, they will ever attempt to do.

It is hardly necessary to notice here the objection to the validity of this act on the ground that it divests the old boards, and in some instances, perhaps, the city corporation or the common council, of the title to property, and transfers it to, and vests it in, this board.

All those previous boards, and the city corporation itself, held whatever property they did hold in the right, and for the public benefit, of the city, as a public trust for municipal purposes; and in it was clearly competent for the legislature to transfer it to another public board, to be held in the same manner for the same public use and benefit.

It was also urged upon the argument that this act vests in this board an almost unlimited power of taxation, which they may exercise without consent of the common council or the people. But, upon a careful examination of the act, in connection with the charter, I think it gives, properly speaking, no power of taxation; at least, none which is not subject to the approval or disapproval of both the common council and the people.

This disposes of every objection urged against the con-

24 MICH.—10.

stitutional validity of the act, except that which arises upon the provisions of the first section, requiring the board to be "composed of four persons, who shall be freeholders and qualified electors of said city, *taken in equal numbers from the two political parties represented in the common council,*" and that part of the third section,. which provides that "all vacancies in said board, whether by expiration of term of service or otherwise, shall be filled by the common council of said city by the vote of a majority of all the aldermen elect; and whenever such vacancy is filled, the person so elected shall be of the same political party as his predecessor; and no person shall be eligible to hold a seat in said board who is not a freeholder in said city, and a qualified elector."

It is only to the particular feature requiring the members to be selected from the "two political parties represented in the common council," that the objection is made. It appears by the record, that these parties were what is known as the republican party and the democratic . party. But this court cannot take judicial notice of the elements or opinions which must necessarily enter into the composition to constitute a member of either nor recognize the distinctive difference in the resultant compound by which the identity of each or the membership of either, is to be determined. There is no fixed legal standard of what shall constitute the one or the other; and this statute has not attempted to fix one. Had it done so, it might be found to need more frequent amendment than even the Compiled Laws. The court may, however, recognize the general laws of human nature upon which parties are founded, and among these, that in all popular governments the people naturally range themselves into parties, and very generally into two great parties, in open and vigorous contest for the control of the government. But change, continual change,

is the law of their existence. There is a continual disintegration and re-integration going on, and not unfrequently an exchange or interchange of elements taking place between them.

No fixed definition can therefore be given to a party from the distinctive principles it supports or opposes. Parties are not always what their names indicate. The definition must, in its nature, be merely nominal, if to continue for any definite time. One might as well undertake to identify the flickering rays of an aurora of last year, with those appearing to-night, as to give a *real* definition of a party from its elements or favorite measures to-day, which shall be correct a few years hence. This act, therefore—the first ever brought to my knowledge which has attempted to recognize parties as permanent—if it intended that their identity should be determined by any thing more than the mere name of the organization to which an individual might profess to belong, has attempted a mere impossibility. It is probable the act refers to the "parties represented in the common council" *at the time of its passage;* otherwise it might be rendered nugatory upon the election of a council all of one party; and it seems to ignore the possibility of members of a third party being elected to the council, or that all the council might be of such party, or perhaps of no political party. Whether these provisions, in their nature, admit of complete enforcement or can be considered any thing more than directory, may admit of doubt, and it is not, I think, necessary to be decided here.

But parties, though necessary in national, and perhaps in state affairs, like every thing human, have some incidental evils; and these evils culminate in large cities. The only issues upon which the great parties are formed being national, or pertaining possibly in some measure to state

policy, have little or no bearing upon municipal rights, interests or objects. And the most ignorant, and therefore the most mercenary and depraved, being found mainly in the larger cities, parties are too apt to make city elections a mere school for party drill, without reference to the interests of the municipality; and partisan leaders, for selfish purposes, treating these ignorant and mercenary masses as so much stock in trade, are too apt, when elected, to make use of their official position and influence to reward their followers and to secure their future support, and not unfrequently, when conscious of strong party support, to enter into schemes and combinations for profiting by the public funds under their control, or to participate in the profits of contracts of which they have the disposal; all which tends to the subversion of the public welfare, to exclude from office the better classes of men, who would look to the public interests rather than to those of a party, or their own. The object of the legislature in the provision under consideration was, doubtless, to prevent, as far as possible, this class of evils, and to secure the services of a class of men who would not allow mere partisan interests to outweigh those of the public; and by taking them equally from the two great parties, the temptations to, and the facilities for, mere partisan action would, it was supposed, be removed. The object, all must admit, was a good one; it was, in effect, rather to destroy than to create a partisan test, and to lessen the abuses and evils of partisanship.

But the objection is now urged to the validity of this provision, that it creates a "test, or qualification" for office forbidden by the constitution, by excluding from these offices all who do not belong to one of those political parties.

It is insisted, *first*, that the provision violates § 7, *Art. XVIII.*, of the constitution, which, after prescribing the

constitutional oath of office, declares that "no other oath, declaration, or test shall be required as a qualification for any office of public trust;" and, *second,* that it is in violation of § *2, Art. VII.,* securing the right of electors to vote by ballot.

The reasons given for the second objection, if well founded, tend very strongly to weaken, if not entirely to remove, the first. The provision, it is urged, cannot be carried into effect without an inquisition into the character and contents of a citizen's ballot—this being the only test of the membership of the party—and, as it has been decided by this court, in *People v. Cicotte,* that the voter cannot be compelled to disclose the contents of his ballot, or how he voted, there is no possible way of enforcing the provision. If this is true, then the supposed new test or qualification cannot be enforced, and § *7, Art. XVIII.,* will not be likely to be violated by a qualification not admitting of enforcement. But, to return to the first point, if this provision is a test or qualification which is prohibited by the constitution, so is that which requires the members of this board to be freeholders; and if this act is to be dclared void upon *this* ground, several other acts of the legislature must share the same fate, and among them, the act creating the board of water commissioners (the old board whose powers are by this act transferred to the new board, and who are respondents in this case), and that. creating the metropolitan police for the city. The same qualification is contained in the act creating the board of water commissioners (§ *2*), in the "act to establish a police government for the city of Detroit" (§ *3*); and in the "act to incorporate the village of Mt. Clemens," April 4, 1851 (*Sess. L. 1851, p. 101, § 19*), it is provided that "no person shall be eligible to any office in this corporation unless he shall have resided in said corporation *one year* next pre-

ceding his election,"—which is equally a test or qualification (and see § *6* of same act, giving council power to declare the qualification of certain officers,—subject doubtless to those fixed in § *19*). Those features still remain unrepealed, though the act has been several times amended. How many more acts may be found containing a similar principle, I am not prepared to say, as I have made no special examination for this purpose.

But I do not think the question of the constitutionality of either of these alleged qualifications calls for a decision in the present cases, for the following reasons:

1. Because, if the provision requiring either of these qualifications is void, it binds no one, and the common council may proceed, at the proper time, to elect, if they see fit, a member of the board, who does not belong to either of the parties referred to, or who is not a freeholder in the city; and when such an election shall be made and contested, it will be time enough to decide the question; until then no constitutional right is in controversy. They may never be inclined to elect one who is not of one of the parties named, or not a freeholder; and it can certainly be no objection to the election of a member that he may happen to come within both the supposed qualifications.

But 2. The right of the relators to hold these offices does not depend upon an election by the council. They were appointed by the legislature; and if the legislature had a right to appoint any persons to these offices, even provisionally,—as I have endeavored to show we must hold they had,—they had the right to select them for such reasons or such qualifications as they pleased; they had the right to appoint these men, though belonging in equal numbers to the two political parties, and all freeholders. Neither of these supposed qualifications renders them any the *less fit or competent*. The question, therefore, of the constitutionality

of these alleged qualifications, or either of them, cannot arise at all upon *their* appointment, or affect in any respect *their* right to these offices and to enter upon their duties. I do not, therefore, think it necessary to express in the present cases any opinion upon the constitutional validity of the alleged qualifications required by the act, nor whether they are, in any proper sense, tests or qualifications, within the meaning of the constitution.

For the reasons I have given I think judgment of ouster should be rendered against the respondents in these cases, and that the relators have established their right to, and are entitled to hold, their offices as members of the board of public works, as claimed and alleged in the informations, and that the relators should recover their costs.

CAMPBELL, CH. J.

This controversy turns chiefly upon the validity of the act creating a board of public works in the city of Detroit. The questions presented arise upon the source of the appointment, and upon the extent of the powers of the board, as well as upon some independent objections.

It was suggested on the argument that the first of these inquiries was barred by our decision in the case of *The People v. Mahaney, 13 Mich. R., 492,* where the validity of the police act was sustained. That decision held that police commissioners might be lawfully appointed by state authority. No question was there discussed concerning the power of the legislature to make the first appointments, instead of the governor, and that point, therefore remains open. The decision can only dispose of this case upon the assumption that the police commissioners are essentially city officers in the same sense that the board of works are city officers. That, then, is a question presented at the outset of the inquiry in the present litigation, in connection with the

consideration of the relative powers of the executive and legislative departments of the state government.

The clause in the constitution which is supposed to have immediate reference to the power of the legislature over municipal officers, is § *14, of Art., XV.* That section, which occurs in the article entitled of *" Corporations,"* provides that "judicial officers of cities and villages shall be *elected,* and all other officers shall be *elected or appointed, at such time and in such manner, as the legislature may direct."* From the article in which it is found, this section can only apply to officers of the municipality, whether city or village. If there is any restriction on the power of the legislature over officers not municipal it must be found elsewhere. And, there being no express provision on the subject, any such limitation must be found in some manifest implication.

The only one which has been thought of, is that which rests in a supposed distinction between the legislative and executive powers concerning appointments to public trusts. These powers have been kept separate with some jealousy, and for very good reasons. The courts are bound to prevent encroachments by one upon the other, when they are evident. But the line is not so clearly drawn as to be free from doubt, and so far as practical construction goes under the old constitution, it must have weight in construing the present one. The language of both instruments concerning the distinction of powers is substantially identical. While, under the old constitution appointments to office were generally by the executive, there are many instances of state boards and agencies named, in the first instance, by the legislature, where the governor had no voice in the first selection beyond his part in approving the statute making the appointments. The practice is not in harmony with the general theory of the constitution, and if the governor should object to the persons named, I am not prepared to

hold that his objections could be overruled by a two-thirds vote, as they might be if directed against the body of the statute. When such a case arises, I think the point worthy of consideration. But inasmuch as none but the first appointments under the police act were to be legislative, and the governor approved the bill containing the names, I am satisfied that they were sustainable on the former practice, if the state could make them at all; and we have decided that this could be done. The only remaining question, therefore, concerning the application of our former decision to this case is, whether the police board is a state or a municipal agency. If the former, that decision concludes nothing now before us. If the latter, it ends one important part of this controversy. I think it is clearly an agency of the state government, and not of the municipality.

The only confusion existing on this subject has arisen from the custom prevalent under all free governments of localizing all matters of public management, as far as possible, and of making use of local corporate agencies whenever it can be done profitably, not only in local government, where it is required by clear constitutional provisions, but also for purposes of state. Illustrations of this might easily be multiplied. The whole system of state taxation, under our laws, is made to depend on the action of town and county officers, who make the assessments and collect most of the taxes. And the whole machinery of civil and criminal justice has been so generally confided to local agencies that it is not strange if it has sometimes been considered as of local concern. But there is a clear distinction in principle between what concerns the state and that which does not concern more than one locality; and where the constitution has made no rule for their management, affairs belonging to state policy must be subject to immediate state control, if the legislature shall deem it necessary.

24 MICH.—11.

While the preservation of the public peace and the sup-
pression of criminal disorders have very generally been
intrusted, more or less, to municipal authorities, this con-
trol has not been given to all municipalities, and has never
been confided to any municipality without some exceptions
and qualifications. There have always been officers of the
peace, neither elected nor appointed by local authority.
When Michigan was a territory we had cities, towns, vil-
lages and counties as we have now, and with very similar
powers over their own concerns. But sheriffs and justices
of the peace were here, as they generally are in England,
appointed by the executive. No municipality in this state
was ever allowed to determine for itself what courts should
be created within it, or to regulate their jurisdiction, or
to delegate the powers of conservators of the peace to per-
sons not indicated for that purpose by the legislative direc-
tion. And such was the law of England. Mr. Kyd says:
"If the king, by his charter, incorporate a town by the
name of mayor and twelve aldermen, they will not have
any power as conservators or justices of the peace without
an express clause for that purpose; they can neither fine
nor imprison, and if they assume such authority it will be
an usurpation; and it is for this reason that charters usu-
ally add these powers by express words, and make the mayor
or aldermen justices of the peace or gaol delivery; but they act
in these capacities not because they are mayor or aldermen,
but because, by the charter, they are expressly annexed to
their respective offices; and the union of different powers
in one person does not confound his several and distinct
capacities."—1 Kyd on Corp., 327, citing 3 Mod., 12; 2 Ld.
Raym., 1030.

In the celebrated case of the *quo warranto* against the
city of London, the information charged, as separate fran-
chises, the existence of the municipal organization, the

choice of sheriffs, and the functions of the mayor and aldermen of being justices of the peace and of holding sessions of the peace. And in its pleas the city set up these several franchises as derived from different sources. The city corporation was rested on prescription confirmed by the great charter and by other charters and statutes. The power of choosing sheriffs, not only for London, but also for the county of Middlesex, was granted by King John. The grant that the mayor and aldermen should be justices of the peace was made by charter of Charles I., less than fifty years before the prosecution.—*8 St. Trials, 1047-8-9.* The powers given to London were, in many things, quite exceptional, and put the city very much on the footing of a county Palatine in some respects, though in others not interfering with the common course of the realm.

The preservation of the peace has always been regarded, both in England and in America, as one of the most important prerogatives of the state. It is not the peace of the city or county, but the peace of the king or state that is violated by crimes and disorders. The prosecution is on behalf of the state. The trial is before tribunals created and regulated by the state. The remission of punishment is by the governor of the state. Our constitution confides the judicial power to no courts but those organized under the direct sanction and regulation of state law. No portion of this power can be delegated to cities. Courts may be established to act in municipalities, and their judges may be elected by the citizens, but their powers must all be defined by state legislation, which authorizes and establishes them. The numbers and qualifications of jurors are under state control. The whole judicial power is governed by Article VI., of the constitution, and it cannot be lodged anywhere except as authorized by that article. All process runs in the name of the people of the state of

Michigan.—§ *35.*  The nature of the judicial power as a matter of general and not of local concern, was somewhat discussed in the case of *The People v. The Board of Auditors of Wayne County, 13 Mich. R., 233.*

The general purposes of the police act were such as appertain directly to the suppression of crime and the administration of justice.  There is, therefore, no constitutional reason for holding it to be other than a regulation of matters pertaining to the general policy of the state, and subject to state management.  Whether there may or may not be some provisions in the act not confined to the main purpose, and whether any of those provisions are liable to objection on that ground, or not, we have never been required to consider, and have never decided.  The present controversy, therefore, is not affected by the ruling on the police act.

There is no dispute concerning the character of the public works act.  Its purposes are directly and evidently local and municipal.  And the main point to be decided is, whether the legislature of the state can, without the concurrence of the city of Detroit, select the local officers of the city.

No question arises concerning the power of giving corporate existence to those agencies lawfully created within the city that might have been administered by individuals. Any function of administration may be performed by an incorporated board or commission, or by an officer made a corporation sole, if it is thought best.  All cities of any size must have a large amount of administrative business that requires effective agencies having some discretion, and where any business can be properly deputed to such agencies their incorporation has been very usual and its legality is conceded by every one.

Neither can it be held that the designation by name of

the incorporated members of such boards would be open to complaint, if previously selected or subsequently accepted by the city. If assent is in fact given, it can make no difference in principle whether it be by previous nomination or subsequent ratification. Our statute books contain many examples of acts not valid when done, that have been legalized by subsequent legislative assent. The necessity of having public affairs so conducted as to lead to as little dispute as possible concerning the official authority of persons in actual incumbency, has led not only to the recognition of officers *de facto*, whenever there is an office in existence that might be lawfully full at the time, but also to a presumption of regularity in many cases, where there has been any considerable acquiescence by those who are chiefly interested in disputing it. Where a public corporation has been recognized and dealt with long enough to render it unsafe and unjust to disturb it, and the legality of its existence is only questioned for defects that could have been cured by popular or public action, that continued acquiescence is justly regarded as equivalent to the more formal assent that would have made the proceedings technically valid. This doctrine was applied to sustain the legal existence of a township, in *People v. Maynard, 15, Mich. R., 463,* as it was in regard to a county organization by the New York court of appeals, in *Rumsey v. People, 19 N. Y., 41.* This principle will not go beyond an *estoppel* against denying their legal existence for legitimate purposes. It simply assumes their existence to be regular, if it could have been made so. It gives them no powers which it would be unlawful to vest in such bodies.

We must assume, then, in regard to all the city boards heretofore created for municipal purposes, that where the first corporators have been named in the acts, and the

appointment of their successors has devolved upon the city authorities, the nomination has been made or adopted by the city, and that no objection can now be made in contravention of that assumption.  In most, if not in all cases, this is known, as a matter of fact, to have been the case; but whether this be so or not, makes no legal difference. In regard to the house of correction, even if the representation of the state could be regarded as at all controlling in its management, its position as a criminal prison gives the state duties as well as rights in its regulation.

In the litigation now before us there is no acquiescence by the city in the choice of the board of works, or in any part of the legislative action on the subject.   We are, therefore, compelled to consider the plain question, whether the state authorities have a right to assume unlimited control of all municipal appointments.   Judicial offices the constitution has distinctly provided for as elective; and they are local in their action rather than in their nature.  But as to other offices the power is plenary, or it does not exist at all.   It may as well include every office as any less than all.   It may put all the power into the hands of one person, as well as divide it among several, and it may continue it for life as well as for a less period.  Life tenure is not rare in municipal offices.   The aldermen of London, and probably of many other cities, hold for life.   It may create incorporated cities and villages in such numbers as to put the great mass of local administration in the hands of state agents.   This is not very likely to happen, but it is just as likely as many other things which it has been thought proper to guard against by constitutional enactment.   It is, beyond dispute, directly opposed to the principal design of all our constitutions, and if it has not been guarded against there has been a very great oversight, and

the present legislation shows that the danger was not imaginary. But the constitution is not fairly open to such criticism.

We must never forget, in studying its·terms, that most of them had a settled meaning before its adoption. Instead of being the source of our laws and liberties, it is, in the main, no more than a recognition and re-enactment of an accepted system. The rights preserved are ancient rights, and the municipal bodies recognized in it, and required to be perpetuated, were already existing, with known elements and functions. They were not towns or counties or cities or villages, in the abstract—or municipalities which had lost all their old liberties by central usurpation—but American and Michigan municipalities ·of common-law origin, and having no less than common-law franchises. So far as any indication can be found, in the · constitution of 1850, that they were to be changed in any substantial way, the change indicated is in the direction of increased freedom of local action, and a decrease in the power of the state to interfere with local management. Having enjoined it upon the legislature to "provide for the incorporation and organization of cities and villages" (*Art. XIV.,* § *13*), a clause was inserted for the express purpose of removing doubts on a controverted question authorizing the legislature to confer upon townships, cities, and incorporated villages, and on boards of supervisors, such powers of a local legislative and administrative character as they may deem proper.—*Art. IV.,* § *38.* And there are many other clauses which assume that such powers will be given. It is also to be noted that cities are mentioned in connection with local corporations, which are put upon a ·popular basis entirely beyond legislative interference, so far as local independence of action is concerned; so that if the people of cities have not similar immunities, we have in the same commonwealth two classes

of citizens with very different measures of freedom,—one
almost unlimited and one not much more than nominal.

Incorporated cities and boroughs have always, both in
England and in America, been self-governing communities
within such scope of jurisdiction as their charters vest in
the corporate body. According to the doctrine of the com-
mon law, a corporation aggregate for municipal purposes is
nothing more nor less than "investing the people of the
place with the local government thereof."—*Salk. 193.* In
the absence of any provision in the charter creating a rep-
resentative common council, the whole body of freemen
make the common council, and act for the corporation at
their meetings.—*Comyn Dig.* "*Franchises*," (*F.*) *25.* It is
agreed by historians that originally all boroughs acted in
popular assembly, and that the select common council was
an innovation, which may have been of convenience or by
encroachment. In modern times cities have generally acted
in ordinary matters by such a select body. But townships
still act by vote at town meetings, and for many purposes
connected with taxation the people of cities usually have
the same privilege. But whether acting directly or by their
representatives, the corporation is, in law, the community,
and its acts are their acts, and its officers their officers.
The doctrine is elementary that all corporation officers must
derive office from the corporation.—*Kyd, ch. 3, § 8.* This
has been from time immemorial settled law. By articles
fifteen and sixteen of the great charter, it was stipulated
that the liberties and free customs of London and all other
cities, boroughs, towns, and ports should be preserved. Those
liberties were all connected with and dependent upon the
right to choose their own officers and regulate their own
local concerns. The sole motive of the infamous proceed-
ings of Charles II. to procure the forfeiture of these cor-
porate charters, was to enable him to interfere in the selection

of corporate officers. . When he had secured a decision against the city of London, adjudging the charter forfeited on trumped-up charges · of sedition and illegal tolls, he offered, through Lord Keeper North, to respite the judgment, if the city would give him such a right of control over its election of officers as to enable him to exclude persons not acceptable to the Crown.—*8 State Trials, 1281; Lives of Lord Chancellors, Vol. 4, p. 318-19*. These interferences with both the English and the American colonial charters were always regarded as legal outrages, and contrary to all constitutional principles, and one of the first acts of parliament, after the revolution of 1688, was passed to prevent any future action of that kind.

Our constitution cannot be understood or carried out at all, except on the theory of local self-government; and the intention to preserve it is quite apparent. In every case where provision is made by the constitution itself for local officers, they are selected by local action. All counties, towns, and school districts are made to depend upon it. All elections are required to be in local divisions where electors reside. Cities are represented in the board of supervisors, and it is quite possible for their members to outnumber the rest. It certainly cannot be that the state can control those bodies by sending its own agents there, and it cannot be possible that it was contemplated that any members of that board should be selected by a different mode of election or appointment from the rest. Cities may become counties, and surely there can be no county without popular institutions. Cities have been judicially declared to come within the denomination of " townships" so far as to be entitled to library money; and unless they are made to include school districts, they need not be compelled to have free schools. No one would venture to assume that the constitution was designed to leave them in such a position.

It is impossible to read that document without finding the plainest evidence that every part of the state is to be under some system of localized authority emanating from the people.

This is no mere political theory, but appears in the constitution as the foundation of all our polity. There is no middle ground. A city has no constitutional safeguards for its people, or it has the right to have all its officers appointed at home. Unless this power is exclusive, the state may manage all city affairs by its own functionaries. The only reasonable meaning of the constitutional clause in question is, that when the legislature has designated the time and manner of appointment or election, the local authority shall fill the offices as so ordained.

Assuming (what I think is not admissible) that the legislature could make provisional appointments to set an act in operation, this is not such action. The board appointed have no other or different powers than any of their immediate or remote successors would have. The law contains nothing requiring or authorizing any mere preliminary action. The officers are to hold by classified terms, just as the judges of the supreme court and board of regents did, for two, four, six, and eight years, and no successors can be chosen by the city short of the expiration of those periods without directly violating the terms of the law. It is not admissible construction to insert a meaning which is inconsistent with, and positively contradicts, the plain terms of the statute. And if any such general power of provisional appointment exists, it would have been as lawful to appoint temporary judges, as commissioners. It therefore follows necessarily, that the statute can have no validity, because there is no lawful way of putting it in operation.

I think also, that the provision concerning the partisan character of the board, although doubtless well meant, does

in effect exclude the power of selecting men on their merits, and makes political orthodoxy an indispensable test. It was urged that the test is harmless because nugatory and impracticable, and that at most the provisions requiring it are merely directory, and may be disregarded. If the first section of the act, stating that the members of the board "shall be taken in equal numbers from the two political parties represented in the common council," stood alone, there might be some ground for construing it as directory, in the absence of any means for prepetuating the system of partisan choice. But it goes on to name certain persons, and in the third section declares that whenever any vacancy is filled "the person so elected shall be of the same political party as his predecessor." There is no ground for holding that this qualification was not to be as binding as any other.

Such a rule is not by any means nugatory. It is quite as easy to show a man's political as his religious affiliations. These are constantly inquired into in determining rights of voting in churches. If such provisions in regard to matters of religious attachment were of no efficacy, it would have been a very foolish thing to make the bitter and just complaints which have been uniformly made against the persecution and disfranchisement of non-conformists. There are very few intelligent citizens who have not well known and decided political notions and affinities, or whose position cannot be learned and proven very easily.

Our constitution, after prescribing certain official oaths, requiring the support of the union and state constitutions, and official fidelity, declares that "no other oath, declaration, or *test* shall be required as a qualification for any office of public trust."—*Art. XVIII.*, § *1*. This clause must have been intended for some useful purpose. It excludes everything which falls within the mischief indicated by the

word "*test.*" It is not disputed by any one that this forbids any application of tests of religious opinion. But as *Art. IV.*, § *41* expressly forbids the enlargement or restriction of civil and political rights on account of religious opinions, there was no need of it for any such purpose. The word evidently is used in a sense broad enough to cover opinions of every kind, and without this broad construction there would be very little to hinder any dominant party from perpetuating its supremacy. The ordinary usages of the language recognize this broad meaning. Political proscription has not been unknown in history, and has been quite as remorseless as any other, and quite as tyrannical.

In *Cummings v. Missouri, 4 Wal., 277,* the oaths there under consideration, were spoken of by the court as test oaths, and reference was there made to such oaths in other countries, embracing civil as well as religious matters. Our naturalization laws require evidence of attachment to the constitution and government of the United States. This is as much a *test* as the oaths of allegiance and supremacy; and if honestly applied, is supposed to be of some efficacy. The phraseology of the provision in our own constitution, fiixing the form of the oath to be taken, treats it as a *test* oath, and forbids, not "*any* test" but any "*other*" test. The word, in legal and general acceptation, is confined to opinions and bias, and to such conduct as naturally indicates the political or religious prepossessions of persons. It never was applied to property or any other qualifications not bearing on supposed mental conditions.

That the mischiefs may not be serious is not an admissible argument. It is certainly possible for other parties to exist than the two assumed to include all the present members of the common council. It is quite possible for either of those parties to represent no larger constituency than

any third or fourth party, or to be left in a position of political insignificance. And it is not impossible that when vacancies are to be filled, the man who may be considered most desirable, under the circumstances, may not be eligible, and that of those who are eligible, the one who is fittest may not be willing to act. In whatever light we view it, this law excludes men from office for political opinions, and this the constitution will not permit.

To what extent this statute attempts to give to the board, in addition to administrative powers in the nature of agencies, such legislative authority as, under the constitution, can only be given to the people of the city itself or the immediate representatives of the people, is not a very essential inquiry in this controversy, inasmuch as it does not affect the existence of the offices themselves. Very many of the powers of the board are merely transferred from existing boards, and any excess of authority would call for a decision by itself, when, as a practical question concerning a legally existing body, it would meet with a safer solution than if anticipated as one not now urgent.

I think the law is void, and that the respondent is not guilty of usurpation.

COOLEY, J.

I find no valid objection to the title of the act in question, or to the notice given of its introduction or to the powers conferred. In respect to those matters, I agree in what has been said by my brother Christiancy. Nor do I think the appointment of the first members of the board of public works is necessarily void as an exercise of executive authority. There is no such thing as drawing between legislative and executive power such a clear line of distinction as separates legislative from judicial; and the legislature, in prescribing new rules, have necessarily a large

discretion as to whether the agencies for putting them in force shall be named by themselves or left to the selection of the executive. Nor can the whole act be void because of the provision that the appointees under it shall be members of two certain political parties. That provision, so far as it was designed to control appointments for the future, is simply nugatory, because the legislature, on general principles, have no power to make party affiliation a qualification for office. But so far as the provision can be regarded as a declaration that the appointees named have been selected because they sustained the specified party relations, we need only say that where a right of choice exists, an election cannot be held void because of the reasons assigned for the choice made. It is the duty of every person who has a voice in the selection of a public officer to choose with single eye to the public good; but we know very well that it is impossible to exclude other motives. The nomination of a candidate by a party convention, and his election because he is so nominated, is generally equivalent to saying: "We choose this man because he belongs to our party, and we reject his opponent because he does not;" but no one could suppose that a knowledge of the fact could defeat the election. The choice of an officer is, unfortunately, sometimes made on still narrower grounds; but suppose the legislature should expressly declare: "We select this man for office because he is white," or "because he is black," or "because he is a native American," or "because he is a naturalized citizen," or "because, though he will not make the best officer, he is the most agreeable personally," or "because he is poor and needy;" in any case the declaration may not be creditable to the electoral body, but it is only a public statement of the motives which will often inevitably control in cases in which motives cannot be inquired into. Electors are and must be, in giving their suffrages, gov-

erned by a variety of considerations; and no law can so provide in advance that the proper shall have due weight and the improper be excluded. All that the law can do is to allow freedom of selection by proscribing nobody, and to confer the power of choice upon the persons or body most likely to be governed by correct motives; and the choice then made in conformity to the law must be conclusively presumed to have been made upon the proper grounds. We could not notice a declaration by the electoral board to the contrary, because at most it could only be evidence on a point on which evidence is not receivable. And upon this provision in general I also agree fully in what is said by my brother Christiancy.

These, however, are matters of secondary importance; there lies over and beyond these a question of the highest interest and concern, which cannot be answered without a careful scrutiny of the structure of our government, and an examination of the principles which underlie free institutions in America. We have before us a legislative act creating for the city of Detroit a new board, which is to exercise a considerable share of the authority usually possessed by officers locally chosen; to have general charge of the city buildings, property and local conveniences, to make contracts for public works on behalf of the city, and to do many things of a legislative character which generally the common council of cities alone is authorized to do. The legislature has created this board, and it has appointed its members; and both the one and the other have been done under a claim of right which, unless I wholly misunderstand it, would justify that body in taking to itself the entire and exclusive government of the city, and the appointment of all its officers, excepting only the judicial, for which, by the constitution, other provision is expressly made. And the question, broadly and nakedly

stated, can be nothing short of this: Whether local self-government in this state is or is not a mere privilege, conceded by the legislature in its discretion, and which may be withdrawn at any time at pleasure? I state the question thus broadly because, notwithstanding the able arguments made in this case, and after mature deliberation, I can conceive of no argument in support of the legislative authority which will stop short of this plenary and sovereign right.

Now, it must be conceded that the judicial decisions and law writers generally assert that the state creates the municipal bodies, endows them with such of the functions of corporate life and entrusts them with such share in the local government, as to the legislative judgment shall seem best; that it controls and regulates their action while they exist, subjects them to such changes as public policy may dictate, and abolishes them at discretion; in short that the corporate entities are mere agencies which the state employs for the convenience of government, clothing them for the time being with a portion of its sovereignty, but recalling the whole or any part thereof whenever the necessity or usefulness of the delegation is no longer apparent. This I understand to be the accepted theory of state constitutional law as regards the municipal governments. We seldom have occasion to inquire whether this amplitude of legislative authority is or is not too strongly expressed, for the reason that its exercise is generally confined within such bounds as custom has pointed out, so that no question is made concerning it. But such maxims of government are very seldom true in any thing more than a general sense; they never are and never can be literally accepted in practice.

Our constitution assumes the existence of counties and townships, and evidently contemplates that the state shall continue to be subdivided as it has hitherto been; but it

no where expressly provides that every portion of the state shall have county or township organizations. It names certain officers which are to be chosen for these subdivisions, and confers upon the people the right to choose them; but it does not in general define their duties, nor in terms preclude the legislature from establishing new offices, and giving to the incumbents the general management of municipal affairs. If, therefore, no restraints are imposed upon legislative discretion beyond those specifically stated, the township and county government of any portion of the state might be abolished, and the people be subjected to the rule of commissions appointed at the capital. The people of such portion might thus be kept in a state of pupilage and dependence to any extent, and for any period of time the state might choose.

The doctrine that within any general grant of legislative power by the constitution there can be found authority thus to take from the people the management of their local concerns, and the choice, directly or indirectly, of their local officers, if practically asserted, would be somewhat startling to our people, and would be likely to lead hereafter to a more careful scrutiny of the charters of government framed by them, lest sometime, by an inadvertant use of words, they might be found to have conferred upon some agency of their own, the legal authority to take away their liberties altogether. If we look into the several state constitutions to see what verbal restrictions have heretofore been placed upon legislative authority in this regard, we shall find them very few and simple. We have taken great pains to surround the life, liberty, and property of the individual with guaranties, but we have not, as a general thing, guarded local government with similar protections. We must assume either an intention that the legislative control should be constant and absolute, or, on the other hand, that

there are certain fundamental principles in our general frame-work of government, which are within the contemplation of the people when they agree upon the written charter, subject to which the delegations of authority to the several departments of government have been made. That this last is the case, appears to me too plain for serious controversy. The implied restrictions upon the power of the legislature, as regards local government, though their limits may not be so plainly defined as express provisions might have made them, are nevertheless equally imperative in character, and whenever we find ourselves clearly within them, we have no alternative but to bow to their authority. The constitution has been framed with these restrictions in view, and we should fall into the grossest absurdities if we undertook to construe that instrument on a critical examination of the terms employed, while shutting our eyes to all other considerations.

The circumstances from which these implications arise are: *First*, that the constitution has been adopted in view of a system of local government, well understood and tolerably uniform in character, existing from the very earliest settlement of the country, never for a moment suspended or displaced, and the continued existence of which is assumed; and, *second*, that the liberties of the people have generally been supposed to spring from, and be dependent upon, that system.

DeTocqueville speaks of our system of local government as *the American system*, and contrasts it forcibly with the French idea of centralization, under the influence of which constitutional freedom has hitherto proved impossible. —*Democracy in America, chapter 5*. Lieber makes the same comparison, and shows that a centralized government, though by representatives freely chosen, must be despotic, as any other form of centralization necessarily is. "Self-govern-

ment," he says, "means everything for the people and by the people, considered as the totality of organic institutions, constantly evolving in their character as all organic life is; but not a dictatorial multitude. Dictating is the rule of the army, not of liberty; it is the destruction of individuality."—*Civil Liberty and Self-Government, chap. 21.* The writer first named, speaking of the New England township government, whose system we have followed in the main, says: "In this part of the union the impulsion of political activity was given in the townships; and it may almost be said that each of them originally formed an independent nation. When the kings of England asserted their supremacy, they were contented to assume the central power of the state. The townships of New England remained as they were before; and, although they are now subject to the state, they were at first scarcely dependent upon it. It is important to remember that they have not been invested with privileges, but that they seem, on the contrary, to have surrendered a portion of their independence to the state. The townships are only subordinate to the states in those interests which I shall term *social*, as they are common to all the citizens. They are independent in all that concerns themselves; and among the inhabitants of New England, I believe that not a man is to be found who would acknowledge that the state has any right to interfere in their local interests."—*Democracy in America, ubi supra.* Now, if this author is here speaking of the theory of our institutions, he is in error. It is not the accepted theory that the states have received delegations of power from independent towns; but the theory is, on the other hand, that the state governments precede the local, create the latter at discretion, and endow them with corporate life. But, historically, it is as difficult to prove this theory as it would be to demonstrate that the origin of government is in compact, or that title

to property comes from occupancy. The historical fact is, that local governments universally, in this country, were either simultaneous with, or preceded, the more central authority. In Massachusetts, originally a democracy, the two may be said to have been at first identical; but when the colony became a representative government, and new bands pushed out into the wilderness, they went bearing with them grants of land and authority for the conduct of their local affairs.— *Hutchinson's Massachusetts Bay, ch. 1; Washburn's Jud. Hist. of Mass. ch. 1; Body of Liberties, §§ 62, 66, 72; Elliot's New England, Vol. 4, pp. 425, 427.*

But in Connecticut the several settlements originated their own governments, and though these were doubtless very imperfect and informal, they were sufficient for the time being, and the central government was later in point of time.—*Trumbull's Hist. of Conn., Vol. 1, pp. 132, 498; Palfrey's New England, Vol. 1, p. 454.* What the colony did was only to confer charters, under which the town authority would be administered within agreed limits, and possibly, with more regularity than before. In Rhode Island, it is also true, that township organization was first in order of time.—*Arnold's Hist., of R. I., ch. 7.* This author justly remarks, that when the charter of Rhode Island was suspended to bring her under the dominion of Andros, " *the American system of town governments,* which necessity had compelled Rhode Island to initiate fifty years before, became the means of preserving the liberty of the individual citizen when that of the state, or colony, was crushed."—*Vol. 1, p. 487.* So in Vermont, the people not only, for a time, conducted all their public affairs in towns and plantations, through committees, officers and leaders, nominally appointed and submitted to by general consent and approbation, but they carried on their controversy with New York for some years, without any other organization.—

*Williams' Hist. of Vermont, Vol. 2, p. 163.* In New Jersey, as in Massachusetts, towns were chartered in connection with grants of land, and in some instances, those which were made by Nichols, adverse to the proprietary, were suffered to remain after his authority was superceded.—See instances in *Mulford's Hist. of N. J., pp. 143–4.* The charter to Lord Baltimore plainly recognized local government in the provision requiring the laws and ordinances established to conform to the laws, statutes or rights of England.—*Bozman's Hist. of Maryland, p. 290.* And county authorities seem to have existed from the very first, though their statutory organization, if any they had, cannot be traced.—*Bozman, pp. 299–303.* But it cannot be necessary to particularize further. The general fact was, that whether the colonial or local authority should originate first, depended entirely upon circumstances which might make the one or the other the more immediate need. But when both were once established they ran parallel to each other, as they were meant to do, for all time; and what Mr. Arnold says of Rhode Island, may be said generally of the eastern and middle states, that the attempt of the last two Stuarts to overthrow their liberties, was defeated by means of the local organizations. The scheme tried first in England, to take away the corporate charters in order to make the corporators more dependent on the crown, and to restrain them from political action in opposition to the court party, found, in America, the colonial charters alone within the reach of arbitrary power; and though these were taken away or suspended, it was only with such protest and resistance as saved to the people the town governments. In Massachusetts, it was even insisted by the people's deputies that, to surrender local government was contrary to the sixth commandment, for, said they, " men may not destroy their political, any more than their natural

lives." So, it is recorded they clung to "the civil liberties of New England" as "part of the inheritance of their fathers."—*Palfrey's New England, Vol. 3, pp. 381–383; Bancroft's U. S., Vol. 2, pp. 125–127; Mass. Hist. Col., XXI, 74–81.* The whole contest with Andros, as well as in New England, as in New York and New Jersey, was a struggle of the people in defense of the right of local government. "Everywhere," says Dunlap, "the people struggled for their rights and deserved to be free."—*Hist. of N. Y., Vol. 1. p. 133;* and see *Trumbull's Hist. of Conn., Vol. 1. ch. 15.*

I have confined this examination to the states which have influenced our own polity most; but the same principle was recognized and acted on elsewhere. The local governments, however, were less complete in the states further south, and this, with some of their leading statesmen, was a source of regret. Mr. Jefferson, writing to Governor Tyler in 1810, speaks of the two great measures which he has at heart, one of which is the division of counties into hundreds. "These little republics," he says, "would be the main strength of the great one. We owe to them the vigor given to our revolution, in its commencement, in the eastern states. * * * * Could I once see this, I should consider it as the dawn of the salvation of the republic."—*Jefferson's Works, Vol. 5, p. 525.* Mr. Jefferson understood thoroughly the truth, so quaintly expressed by Bacon, when he said of a burden imposed as compared to one freely assumed, that "it may be all one to the purse, but it worketh diversely upon the courage."

Such are the historical facts regarding local government in America. Our traditions, practice and expectations have all been in one direction. And when we go beyond the general view to inquire into the details of authority, we find that it has included the power to choose in some form

the persons who are to administer the local regulations. Instances to the contrary, except where the power to be administered was properly a state power, have been purely exceptional. The most prominent of these was the case of the mayor of New York, who continued, for a long time after the revolution, the appointee of the governor. But this mode of choice originated when the city was the seat of colonial government, and while it constituted a large part of the colony, and the office was afterwards of such dignity and importance, and was vested with so many general powers, that one of the first statesmen of the nation did not hesitate to resign a seat in the senate of the United States to accept it.—*Hammond's Pol. Hist. of N. Y., Vol. 1, p. 197.* Moreover, the first constitution of New York was, in important particulars, exceptional. That state had at the time a powerful aristocratic element, by which its first institutions were in a great measure shaped; and a distrust of popular authority was manifest. It is scarcely needful to say that features of that character disappeared when the constitution was revised.

For those classes of officers whose duties are general,— such as the judges, the officers of militia, the superintendents of police, of quarantine, and of ports, by whatever name called,—provision has, to a greater or less extent, been made by state appointment. But these are more properly state than local officers; they perform duties for the state in localities, as collectors of internal revenue do for the general government; and a local authority for their appointment does not make them local officers when the nature of their duties is essentially general. . In the case before us, the officers in question involve the custody, care, management, and control of the pavements, sewers, water-works and public buildings of the city, and the duties are purely local. The state at large may have an indirect interest in an

intelligent, honest, upright and prompt discharge of them; but this is on commercial and neighborhood grounds rather than political, and is not much greater or more direct than if the state line excluded the city. Conceding to the state the authority to shape the municipal organizations at its will, it would not follow that a similar power of control might be exercised by the state as regards the property which the corporation has acquired, or the rights in the nature of property which have been conferred upon it. There are cases which assert such power, but they are opposed to what seem to me the best authorities, as well as the soundest reason. The municipality, as an agent of government, is one thing; the corporation, as an owner of property, is in some particulars to be regarded in a very different light. The supreme court of the United States held at an early day that grants of property to public corporations could not be resumed by the sovereignty.—*Terrett v. Taylor, 9 Cranch, 43; Town of Pawlet v. Clark, ibid., 292;* and see *Dartmouth College v. Woodward, 4 Wheat., 694–698.* When the state deals with a municipal corporation on the footing of contract, it is said by Trumbull, J., in *Richland v. Lawrence, 12 Ill., 8,* the municipality is to be regarded as a private company. In *Detroit v. Corey, 9 Mich., 195,* Manning, J., bases his opinion that the city was liable for an injury to an individual, occasioned by falling into an excavation for a sewer, carelessly left open, upon the fact that the sewers were the private property of the city, in which the outside public or people of the state at large had no concern. In *Warren v. Lyons, 22 Iowa, 351,* it was held incompetent for the legislature to devote to other public uses land which had been dedicated for a public square. In *State v. Haben, 22 Wis., 660,* an act appropriating moneys collected for a primary school to the erection of a state normal school building in the same city

was held void. Other cases might be cited, but it seems not to be needful. They rest upon the well understood fact that these corporations are of a two-fold character; the one public as regards the state at large, in so far as they are its agents in government; the other private, in so far as they are to provide the local necessities and conveniences for their own citizens; and that as to the acquisitions they may make in the latter capacity as mere corporations, it is neither just, nor is it competent, for the legislature to take them away, or to deprive the local community of the benefit thereof. There may come a time when from necessity the state must interpose. The state may change municipal boundaries; and then a division of the corporate property may be needful. The state may take away the corporate powers, and then the property must come to the state as trustee for the parties concerned. In either of these cases, undoubtedly, state action becomes essential; and the property may be disposed of according to the legislative judgment and sense of justice; but even then the appropriation must have regard, so far as the circumstances of the case will admit, to the purposes for which the property was acquired, and the interest of those who were corporators when the necessity for state intervention arose.

In view of these historical facts, and of these general principles, the question recurs whether our state constitution can be so construed as to confer upon the legislature the power to appoint for the municipalities, the officers who are to manage the property, interests, and rights in which their own people alone are concerned. If it can be, it involves these consequences: As there is no provision requiring the legislative interference to be upon any general system, it can and may be partial and purely arbitrary. As there is nothing requiring the persons appointed to be citizens of the locality, they can and may be sent in from

24 mich.—14.

abroad, and it is not a remote possibility that self-government of towns may make way for a government by such influences as can force themselves upon the legislative notice at Lansing. As the municipal corporation will have no control, except such as the state may voluntarily give it, as regards the taxes to be levied, the buildings to be constructed, the pavements to be laid, and the conveniences to be supplied, it is inevitable that parties, from mere personal considerations, shall seek the offices, and endeavor to secure from the appointing body, whose members in general are not to feel the burden, a compensation such as would not be awarded by the people, who must bear it, though the chief tie binding them to the interests of the people governed might be the salaries paid on the one side and drawn on the other. As the legislature could not be compelled to regard the local political sentiment in their choice, and would, in fact, be most likely to interfere when that sentiment was adverse to their own, the government of cities might be taken to itself by the party for the time being in power, and municipal governments might easily and naturally become the spoils of party, as state and national offices unfortunately are now. All these things are not only possible, but entirely within the range of probability, if the positions assumed on behalf of the state are tenable. It may be said that these would be mere abuses of power, such as may creep in under any system of constitutional freedom; but what is constitutional freedom? Has the administration of equal laws by magistrates freely chosen no necessary place in it? Constitutional freedom certainly does not consist in exemption from governmental interference in the citizen's private affairs; in his being unmolested in his family, suffered to buy, sell and enjoy property, and generally to seek happiness in his own way. All this might be permitted by the most arbitrary ruler, even though he

allowed his subjects no degree of political liberty.    The government of an oligarchy may be as just, as regardful of private rights, and as little burdensome as any other; but if it were sought to establish such a government over our cities by law, it would hardly do to call upon a protesting people to show where in the constitution the power to establish it was prohibited; it would be necessary, on the other hand, to point out to them where and by what unguarded words the power had been conferred.    Some things are too plain to be written.    If this charter of state government which we call a constitution, were all there was of constitutional command; if the usages, the customs, the maxims, that have sprung from the habits of life, modes of thought, methods of trying facts by the neighborhood, and mutual responsibility in neighborhood interests, the precepts which have come from the revolutions which over-turned tyrannies, the sentiments of manly independence and self-control which impelled our ancestors to summon the local community to redress local evils, instead of relying upon king or legislature at a distance to do so,—if a recognition of all these were to be stricken from the body of our constitutional law, a lifeless skeleton might remain, but the living spirit, that which gives it force· and attraction, which makes it valuable and draws to it the affections of the people, that which distinguishes it from the numberless constitutions, so called, which in Europe have been set up and thrown down within the last hundred years, many of which, in their expressions, have seemed equally fair and to possess equal promise with ours, and have only been want-ing in the support and vitality which these alone can give, —this living and breathing spirit, which supplies the inter-pretation of the words of the written charter, would be utterly lost and gone.

Mr. Justice Story has well shown that constitutional

freedom means something more than liberty permitted; it consists in the civil and political rights which are absolutely guarantied, assured and guarded; in one's liberties as a man and a citizen,—his right to vote, his right to hold office, his right to worship God according to the dictates of his own conscience, his equality with all others who are his fellow-citizens; all these guarded and protected, and not held at the mercy and discretion of any one man or of any popular majority.—*Story, Miscellaneous Writings, 620.* If these are not now the absolute right of the people of Michigan, they may be allowed more liberty of action and more privileges, but they are little nearer to constitutional freedom than Europe was when an imperial city sent out consuls to govern it. The men who framed our institutions have not so understood the facts. With them it has been an axiom, that our system was one of checks and balances; that each department of the government was a check upon the others, and each grade of government upon the rest; and they have never questioned or doubted that the corporators in each municipality were exercising their franchises under the protection of certain fundamental principles which no power in the state could override or disregard. The state may mould local institutions according to its views of policy or expediency; but local government is matter of absolute right; and the state cannot take it away. It would be the boldest mockery to speak of a city as possessing municipal liberty where the state not only shaped its government, but at discretion sent in its own agents to administer it; or to call that system one of constitutional freedom under which it should be equally admissible to allow the people full control in their local affairs, or no control at all.

What I say here is with the utmost respect and deference to the legislative department; even though the

task I am called upon to perform is to give reasons why a blow aimed at the foundation of our structure of liberty should be warded off. Nevertheless, when the state reaches out and draws to itself and appropriates the powers which from time immemorial have been locally possessed and exercised, and introduces into its legislation the centralizing ideas of continental Europe, under which despotism, whether of monarch or commune, alone has flourished, we seem forced back upon and compelled to take up and defend the plainest and most primary axioms of free government, as if even in Anglican liberty, which has been gained step by step, through extorted charters and bills of rights, the punishment of kings and the overthrow of dynasties, nothing was settled and nothing established.

But I think that, so far as is important to a decision of the case before us, there is an express recognition of the right of local authority by the constitution. That instrument provides (*Art. XV.*, § *14*) that "judicial officers of cities and villages shall be elected; and all other officers shall be elected or appointed, at such time and in such manner as the legislature may direct." It is conceded that all elections must, under this section, be by the electors of the municipality. But it is to be observed that there is no express declaration to that effect to be found in the constitution; and it may well be asked what there is to localize the elections any more than the appointments. The answer must be, that in examining the whole instrument a general intent is found pervading it, which clearly indicates that these elections are to be by the local voters, and not by the legislature, or by the people of a larger territory than that immediately concerned. I think also that when the constitution is examined in the light of previous and contemporaneous history, the like general intent requires, in language equally clear and imperative, that the choice of the

other corporate officers, shall be made in some form, either directly or indirectly, by the corporators themselves.

The previous history I have sufficiently referred to; and it is a part of the public history of the times that the convention which framed the constitution of 1850 had in view as prominent objects, to confide more power to the people, to make officers generally elective, and to take patronage from the executive. We see this in the provisions for the elections of judges, state officers, regents of the university and prosecuting attorneys; in the requirement that banking laws shall be referred to the people for adoption; in the exclusive control given to the supervisors in the settlement of claims against counties, and in the express provision that "the legislature may confer upon organized townships, incorporated cities and villages, and upon the boards of supervisors of the several counties, such powers of a local, legislative and administrative character as they may deem proper." All these were in the direction of popularizing authority. Even the officers who were to perform the duties of master in chancery were required to be elected. When, therefore, we seek to gather the meaning of the constitution from "the four corners of the instrument," it is impossible to conclude that the appointments here prescribed, in immediate connection with elections by the local voters, and by a convention intent on localizing and popularizing authority, were meant to be made at the discretion of the central authority, in accordance with an usage not prevalent since the days of the Stuarts, and which even then was regarded, both in England and America, as antagonistic to liberty and subversive of corporate rights.

So far, then, as the act in question undertakes to fill the new offices with permanent appointees, it cannot be sustained, either on general principles, or on the words of the constitution. It may, nevertheless, not be wholly void.

I have no doubt it was entirely competent for the legislature to abolish the old boards and provide for a new one to take the place of all. That would be but the ordinary exercise of legislative supervision and control in matters of municipal regulation. I think, also, that the legislature might make provisional appointments to put the new system in operation. The right to do this appears to me to be incident to the right to confer and recall corporate power, and rests upon the same ground as the right to provide agencies for the organization of the municipal corporation in the first place, for the apportionment of its property and debts if its territory should be divided and organized into two, or for the winding up of its concerns if the charter should be taken away. There is no doubt of the right of the state to do any of these things; not by virtue of any general authority to take to itself the management of the local concerns, but because the inauguration and modification of local government can only be provided for without confusion and injustice, by the aid of the guiding and assisting hand of the authority that creates and modifies. The right in the state is a right, not to run and operate the machinery of local government, but to provide for and put it in motion. It corresponds to the authority which constitutional conventions sometimes find it needful to exercise, when they prescribe the agencies by means of which the new constitution they adopt is to be made to displace the old.

The difficulty here is, that the appointments made by the legislature are for full terms, and do not assume to be provisional. In this particular they resemble the appointments made by Charles II., under the new charters which he granted to corporate towns, after forcing the surrender of the old, and which were only of the first incumbents.— *Lingard Hist. of England, Vol. 12, p. 342; Hallam Const.*

*Hist., ch. 12.* But these appointments may, nevertheless, be good provisionally. A legislative act is not void for excess of authority at one point, unless the excess is in a particular which precludes giving effect to the rest according to the obvious intent. In this case the excess can hardly be held vital, for we must suppose the object of the legislature, in making the first appointments was not to appropriate patronage to itself, but only to insure the organization of the new system without confusion ; otherwise they would have retained the choice of commissioners permanently. The appointment of these men, then, the conferring upon them of the enumerated powers, and the displacement of old officers, were all entirely within legislative authority. The excess of authority was only in providing that the appointments made should continue for two, four, six and eight years. Now suppose the legislature had expressly made the appointments provisional, and had then provided that two, four, six and eight years hence new appointments should be made, and that in the meantime the common council might fill any vacancies that might occur: Would the whole act be void because it failed to fix a time when the powers of the provisional appointees should cease? I think not. The act was not passed to give four men an office; their appointment was merely incidental to the main purpose. It was immaterial to that purpose whether these men should or should not hold, after they had put the new system into operation. If the exact period for the cessation of their official functions was not named, we must suppose the legislative purpose to have been that the common council, to whom had been given the power to fill vacancies, should proceed to do so whenever in their view the functions of the provisional board had been fulfilled. From that time the provisional

incumbents could rightfully occupy only till appointees were named by the board possessing the general power to appoint.

I think the position of this case is precisely the same that it would have been if the act were as I have supposed. It follows that, in my view, the appointees for the time being are entitled to office, and the defendant and his associates are displaced.

I have said nothing about the choice of these men by bill, because, as a provisional appointment, I think it might be thus made. If they were to be regarded as permanent officers, there would be serious difficulties in the way, which I do not care to enter upon without necessity.

GRAVES, J.

I agree with the chief justice that the act before us is unconstitutional, but I base my objections wholly on the point discussed by him, touching the official terms, the tenure and mode of choice of the first members of the board. The act declares that the term shall be eight years; that the four persons designated by name shall hold for two, four, six and eight years respectively, and that they shall not be removable except upon preferred charges, which shall be sustained by vote of two-thirds of all the members elect of the common council. This is a fundamental part of the whole scheme, without which there is no reason to suppose the act would have passed; and the plain meaning of it is, that a majority of the board shall, for a term of years, consist of legislative appointees, holding independent of the electors and municipal authorities of Detroit.

In view of these express and clear manifestations of the sense of the legislature, I cannot come to any other conclusion than that it was designed that the persons named in the act should hold for fixed and regular terms, and in the

24 MICH.—15.

same way precisely as though they had all been chosen at the same time by the council or voters of the city. Neither the occasion, in point of fact, nor the statute implies the necessity for any merely provisional appointments. The choice is expressly remitted to the council when vacancies occur, and that body was in existence when the act passed and when it took effect; and its competency and aptitude to appoint in the future will be no greater than it has been. With the lights before us, I think it cannot be said that an appointment by the legislature was demanded to meet the needs of a transition state, or to bridge a chasm between an old and new establishment, or to organize or put in motion a new corporate or municipal organism.

We are all of opinion that the legislature is forbidden to make permanent appointments of local officers like those in question. But if the difficulty now encountered can be obviated by considering this appointment as merely provisional, no reason is perceived why the legislature may not perpetuate the practice by continuing to appoint through successive amendments of the statute. In that event, though each appointment should be called provisional, still the effect would be the same as if the legislature were avowedly exercising a conceded power to make permanent appointments.

Agreeing as I do with the chief justice on this branch of the case, and also with the opinions of my brothers Christiancy and Cooley respecting the incompetency of the legislature to make permanent appointments in cases like the present, it is quite unnecessary for me to go over the ground they have examined.