HARLOW P. DAVOCK ET AL. v. CHARLES W. MOORE.

*Constitutional law—Local board of health—Appointment by Governor—Amendment of statute—Transfer of city funds.*

1. Act No. 10, Laws of 1895, entitled "An act to establish a board of health for the city of Detroit," is not open to the objection that it fails to provide for the means of carrying out its requirements, or for any revenue for the board, as, under section 3 of the act, the board is to prepare annual estimates of its expenditures, and file the same with the city controller, who, under the charter of the city (section 1, chap. 8), in the light of which said section 3 must be construed, is to report such estimates to the common council, to go, subject to revision and alteration by that body, into the budget for that year.

2. Said act is not in conflict with section 14, art. 15, of the Constitution of this State, which provides that "judicial officers of cities and villages shall be elected, and all other officers shall be elected or appointed, at such time and in such manner as the Legislature may direct," in that it vests the appointment of the members of the board in the Governor, as, by the provisions of the act empowering the board, whenever the State Board of Health has declared any town or city to be infected with contagious disease, in its discretion, to subject to quarantine all vessels arriving at the port of Detroit from such infected place, for such time as said board may deem necessary for the protection of the inhabitants of said city, and to prohibit or regulate the internal intercourse

by land or water between said city and such infected place, the legislative intent to make the city its agent in government, to prevent the spread of contagious disease, is clear.[1]

3. Said act is not unconstitutional, in that it authorizes the board of health to require money to be raised by an annual tax for local purposes without the consent of any of the local officers or of the boards of the city, as the preservation of the public health is not a local purpose, and the consent of the locality is not material, where the function is a public or general one; citing *People v. Mahaney*, 13 Mich. 481, 500.

4. An amendment, made after the expiration of the first 50 days of the legislative session, of a bill introduced within said 50 days, if germane to the purpose which the original bill had in view, is not within the provision of the Constitution prohibiting the introduction of bills after the expiration of said 50 days.

5. Section 27 of Act No. 337, Local Acts of 1895, which incorporates into the city charter a provision directing the city treasurer to place to the credit of the board of health a certain sum of money for its maintenance for the fiscal year, etc., by transfer from any other funds in the city treasury, and which provides for the replacement of the sum thus transferred by temporary loan, to be repaid from moneys collected from the liquor taxes, is not in conflict with section 1, art. 14, of the Constitution of the United States, which provides that no state shall deprive any person of life, liberty, or property without due process of law; the fund arising from said source being absolutely under the control of the Legislature.

*Certiorari* to Wayne. (Hosmer, J.) Argued April 16, 1895. Decided April 26, 1895.

Relators applied to the circuit court for *mandamus* to compel respondent to issue his warrant for the payment of a check issued by the board of health, and respondent brings *certiorari* to review order granting the writ. Affirmed. The facts are stated in the majority opinion.

[1] The subject of quarantine regulations by health authorities is extensively annotated with the case of *Hurst v. Warner* (Mich.) in 26 L. R. A. 484, while the power of municipal corporations in time of epidemics is treated in a note to *Thomas v. Mason* (W. Va.), 26 L. R. A. 727.

*C. D. Joslyn* and *John D. Conely*, for relators.

*John Atkinson* (*H. H. Hatch* and *John Miner*, of counsel), for respondent.

Long, J. At the present session the Legislature passed an act entitled "An act to establish a board of health for the city of Detroit." [1] The act was approved by the Governor February 27, 1895, and took immediate effect. Under that act the board is to consist of four members, electors and freeholders in the city of Detroit, to be appointed by the Governor, by and with the advice and consent of the Senate. The members of the board of health so appointed at once entered upon their duties as a board of health. This act repealed all former acts providing for a board of health in the city of Detroit, and made it the duty of such former board to turn over to the new board all the property, records, and offices, hospitals and assets, of every name or nature, then in its possession or control, and provided that the new board should assume and pay the bills of the former board. Section 3 of the act provides:

"It shall be the duty of the said board, on or before the first day of March in the year 1895, and on or before the 15th day of February in each following year, to file with the city controller an estimate of the amount of money which, in the opinion of said board, will be required for all purposes of expenditures by said board during the next fiscal year, and such sums so estimated, when raised as provided by this act, shall be appropriated by said board for the prevention of danger to the public health or other purposes contemplated by this act. In the presence of a great and imminent peril to the public health by reason of impending pestilence, the said board may report to the common council that in its judgment the security of the public health requires the expenditure of money in the then fiscal year in excess of the annual appropriation for the purposes of said board as above provided, and the common council

---

[1] Act No. 10, Laws of 1895.

may thereupon cause to be placed to the credit of said board such sum of money as may be required in the judgment of the council, such sum to be taken either from the contingent fund, or the same may be raised by temporary loan, payable within such time as the council may determine, not exceeding three years, and not exceeding in all the sum of $100,000. The money so raised or borrowed shall be paid into the city treasury, and shall constitute a fund to be known as the 'public health fund,' and the same shall be paid out on vouchers approved by the board of health, and checks signed by the president and secretary of the board, drawn upon the city controller, who shall draw his warrant upon the city treasurer in favor of the person named as drawee in said check."

It appears that about $1,600 of bills of the old board remained unpaid at the time the new board entered upon its duties, and that there were no funds in the city treasury belonging to this board of health fund, said fund having been fully exhausted by warrants theretofore drawn. The Legislature thereupon passed an act entitled—

"An act to amend sections two and four of chapter four, section fifty-nine of chapter seven, sections one, six, seven, and eight of chapter ten, and section twenty-seven of chapter eleven, of an act entitled 'An act to provide a charter for the city of Detroit, and to repeal all acts and parts of acts in conflict therewith,' approved June 7, 1883." [1]

This act was approved March 15, 1895, and took immediate effect. Section 27 of that act, as amended, reads as follows:

"Moneys shall not be transferred from one fund to another except as hereinafter provided, and the moneys received and properly belonging to one fund shall not be credited to any other or different fund, excepting to the sinking fund, as above provided. Moneys received from liquor taxes shall be credited to the contingent fund, metropolitan police fund, public health fund, and poor fund in such proportions as the common council

[1] Act No. 337, Local Acts of 1895.

shall direct. The controller, for convenience, shall have power to divide the several funds above constituted into special funds to defray special expenses belonging to the same class of expenses for the payment of which said several sums are above constituted. The common council shall provide for the maintenance of the board of health of said city and the payment of its expenses during the remainder of the fiscal year ending July 1, 1895, by borrowing by temporary loans such sums as may be certified to the common council by the said board to be necessary for the purposes aforesaid, said temporary loan to be repaid from the moneys received during the present fiscal year from liquor taxes, or, if such receipt be insufficient, then from any other moneys in the city treasury. No tax roll shall be held to be void for the reason that an estimate of the amount of money necessary to be raised for any particular fund was not made by any officer, board, or commission authorized or required by law to make an estimate for such purpose within the time specified by law for the making of such estimate, provided such estimate shall be transmitted to the common council in time for the same to be acted upon by the common council and board of estimates. The board of health of said city shall have control and possession of all city hospitals, buildings, and offices pertaining to the health department of said city, and shall annually, on or before the 15th day of February, make an estimate of the amount of money necessary to be raised for the maintenance of said board and for the preservation of the public health for the ensuing fiscal year, which estimate shall be certified to the common council; and it shall be the duty of said council to cause the amount of money mentioned in said estimate to be placed upon the tax rolls and raised by general tax at the same time as other sums are raised by general taxation for the next fiscal year: *Provided,* that, if the said estimate shall exceed $50,000, only so much thereof in excess of $50,000 as shall be approved by the common council and board of estimates shall be levied in any one year: *And provided* further, that the council may, by transfer from the contingent fund as above mentioned, provide for the amount of money required to be raised for the purposes of the public health fund, or for any part thereof, in lieu of raising the same by taxation. The city treasurer shall place to the credit

of the board of health the sum of $12,000 for the maintenance of said board for the remainder of the fiscal year ending June 30, 1895, and for the payment of any existing outstanding liabilities, by transfer to the public health fund from any other funds in the city treasury, and the same shall be paid out on the checks of the board of health in the manner now provided by law for payment from the public health ·fund. The common council may replace the moneys so transferred by temporary loan, to be repaid from liquor taxes paid in to the credit of the contingent fund."

On March 18 the pay roll of the board was made up and approved by the board of health, and a check in the following form drawn in favor of the secretary of the board:

"Pay from the public health fund, as provided by an act entitled 'An act to establish a board of health for the city of Detroit,' approved February 27, 1895, to the order of Charles S. Hathaway, $856.63.

"By order of the board of health.

"HARLOW P. DAVOCK, President.
"CHAS. S. HATHAWAY, Secretary."

This check was presented to the controller, the respondent here, and he was requested to draw his warrant on the city treasurer as provided by law for the payment of the check. The controller refused to draw the warrant, claiming that there were no funds, and that it was unlawful for him to draw his warrant as requested, though his attention was called to the amendment of the charter passed March 15, 1895.

It appears that the city treasurer informed the board that if the circuit court should direct the controller to draw his warrant upon the public health fund he would pay the same as provided by section 27 of the charter, above quoted. The board thereafter presented a petition for *mandamus* to the Wayne circuit court to compel the controller to issue his warrant for the payment of this check. In his answer to that petition, the controller stated substantially that he had been advised by counsel that these statutes were in contravention of the

Constitution and void, and that in view of such advice he deemed it not safe or proper to draw his warrant. He further returned that all the moneys and funds in the treasury of the city, or under control of the city treasurer, were raised and appropriated to the several·funds required by law before the approval ·of the board of health act of February 27, 1895; that all said funds were appropriated for purposes other than the support and maintenance of the· board of health created by that act; that the fund known before that time as the "board of health fund" was exhausted, and he was informed and believed that there was no money or funds in the custody or ·possession of the treasurer available for the support and maintenance of the board, or upon which he could legally draw·any warrant for the payment of the check presented to him. He further returns that the city of Detroit has never recognized the petitioners as a legal health board, but that, on the contrary, the city has filed a bill in the circuit court in chancery to enjoin the petitioners from acting as such board· of health, the treasurer from transferring funds under the statute mentioned, and the controller from drawing warrants upon such funds when transferred for the use of petitioners, and that subpoena has been served upon him. No claim is made that any injunction ever issued thereunder. Upon the hearing upon this petition and answer, the court below directed the writ to issue against the controller, commanding him to draw his warrant for the amount of the check presented. The cause comes here by writ of *certiorari.* The assignments of error are numerous, but may be discussed under a few heads.

1. By the first clause of· section 3 of the act of February 27, the board are to prepare annual estimates of their expenditures, and file the same with the city controller. When such sums so estimated are "raised as provided by this act," they are to be appropriated by the board. It is contended that no provision is made by the act itself to supply the means for carrying out its

requirements, or to provide any revenue for the board, as the second clause of that section only confers power upon the council to raise additional sums of money by the issue of short-time obligations or to be taken from the contingent fund of the city, this clause being designed to meet a special exigency; that, therefore, the act must fail. While the act does not purport to be an amend-ment to the charter of the city of Detroit, this section refers in terms to the city controller and the common council of the city. The act does not attempt to define the powers and duties of the controller. It does provide that the board shall make an estimate annually to the controller. The city charter provides what steps shall be taken by the controller when estimates are made to him. Section 1, chap. 8, Act No. 488, Local Acts of 1887. This section of the charter makes it the duty of the controller to report his estimates to the common council each year of the sums necessary to be raised for each fund, which the council may revise or alter, etc. The Legislature evidently had in mind the duties of the controller in this respect, and the provision that "such sums so estimated, when raised as provided by this act," etc., means the sums estimated by the board and reported to the controller. The language employed can mean nothing else, when we read the whole act. It does not purport to fix a method of raising this revenue different than that fixed by the city charter,—that is, the estimate made by the board to be reported to the controller, and by him returned to the common council, to go into the budget for that year.

2. It is contended that the act is in contravention of section 14, art. 15, of the Constitution of this State, which provides that—

"Judicial officers of cities and villages shall be elected, and all other officers shall be elected or appointed, at such time and in such manner as the Legislature may direct."

The argument is that the board created by the act is

a State board, a State agency, and not a municipal board, and that most, if not all, the powers vested in it are local and municipal, and therefore forbidden by that section of the Constitution. There can be no reason to doubt that the members of this board are "officers," within the meaning of this section, and, if their duties are purely municipal, their election or appointment could not be taken from the municipality, and placed in the hands of the Governor. *People v. Hurlbut*, 24 Mich. 44. We think, however, that the duties of the board are not purely municipal. Municipal corporations are of a two-fold character,—the one public, as regards the State at large, in so far as they are its agents in government; the other private, in so far as they are to provide the local necessities and conveniences for the citizens. The Legislature under the present act is dealing with the city of Detroit as one of its agencies, to protect the public health, and prevent the spreading of pestilential, contagious, or infectious disease. It has empowered this board, whenever the State Board of Health has declared any town or city to be infected with contagious disease, in its discretion, to subject to quarantine all vessels arriving at the port of Detroit from such infected place; for such time as said board may deem necessary for the protection of the inhabitants of said city; and this board may also prohibit or regulate the internal intercourse by land or water between the city of Detroit and such infected place, town, or city, and may direct that all persons who shall come into the city contrary to their prohibition or regulations shall be apprehended, etc. Clearly, it is apparent from the whole act that it was the legislative intent to use the city as its agent in government, to prevent the spread of contagious disease.

In *People v. Mahaney*, 13 Mich. 481, 500, the metropolitan police board act was upheld. Act No. 78, Laws of 1865, p. 99. The Legislature by that act appointed the first board of police for the city of Detroit. It was con-

tended there, as here, that the act was void, as it was subversive of local self-government. It was said:

"Besides the specific objections made to the act as opposed to the provisions of the Constitution, the counsel for respondent attacks it on general principles, and, especially, because violating fundamental principles of our system that governments exist by the consent of the governed, and that taxation and representation go together. The taxation, under the act, it is said, is really in the hands of a police board,—a body in the choice of which the people of Detroit have no voice. This argument is one which might be pressed upon the legislative department with great force, if it were true in point of fact. But, as the people of Detroit are really represented throughout, the difficulty suggested can hardly be regarded as fundamental. They were represented in the Legislature which passed the act, and had the same proportionate voice there with the other municipalities in the State, all of which receive from that body their powers of local government, and such only as its wisdom shall prescribe within the constitutional limit. They were represented in that body when the present police board were appointed by it, and the Governor, who is hereafter to fill vacancies, will be chosen by the State at large, including their city. There is nothing in the maxim that taxation and representation go together which requires that the body paying the tax shall alone be consulted in its assessment, and, if there were, we should find it violated at every turn in our system. The State Legislature not only has a control in this respect over inferior municipalities, which it exercises by general laws, but it sometimes finds it necessary to interpose its power in special cases to prevent unjust or burdensome taxation, as well as to compel the performance of a clear duty. The Constitution itself, by one of the clauses referred to, requires the Legislature to exercise its control over the taxation of municipal corporations, by restricting it to what that body may regard as proper bounds. And municipal bodies are frequently compelled most unwillingly to levy taxes for the payment of claims, by the judgments or mandates of courts, in which their representation is quite as remote as that of the people of Detroit in this police board."

In *People v. Hurlbut*, 24 Mich. 44, the act provided for

the appointment of a board of public works for the city
of Detroit. The act named the first members of the
board, and provided for subsequent appointments by the
common council. Act No. 494, Laws of 1871. It was con-
tended that this act was void, as it took from the munic-
ipality the power to appoint the members, whose duties
were purely of a municipal character. The opinions in
that case cover the whole ground contended for in the
present case, and the distinction is so clearly made
between State and municipal agencies that it is unneces-
sary to more than refer to that case. Chief Justice
CAMPBELL, at page 81, expressly restates the doctrine
of *People v. Mahaney*, upholding the power of the Gov-
ernor to appoint the board of police commissioners for
the city of Detroit, and says:

"The only remaining question, therefore, concerning
the application of our former decision to this case, is
whether the police board is a State or a municipal
agency. If the former, that decision concludes nothing
now before us. If the latter, it ends one important part
of this controversy. I think it is clearly an agency of
the State government, and not of the municipality."

He adds further:

"The only confusion existing on this subject has
arisen from the custom prevalent under all free govern-
ments of localizing all matters of public management,
as far as possible, and of making use of local corporate
agencies whenever it can be done profitably, not only
in local government, where it is required by clear con-
stitutional provisions, but also for purposes of state.
Illustrations of this might easily be multiplied. The
whole system of State taxation, under our laws, is made
to depend on the action of town and county officers, who
make the assessments and collect most of the taxes.
And the whole machinery of civil and criminal justice
has been so generally confided to local agencies that it
is not strange if it has sometimes been considered as of
local concern. But there is a clear distinction in prin-
ciple between what concerns the State and that which
does not concern more than one locality; and, where the

Constitution has made no rule for their management, affairs belonging to State policy must be subject to immediate State control, if the Legislature shall deem it necessary."

Judge COOLEY, on page 103 of the same case, calls attention to the distinction between the classes of officers whose duties are general and such as are municipal or local. He says:

"For those classes of officers whose duties are general, such as the judges, the officers of militia, the superintendents of police, of quarantine, and of ports, by whatever name called, provision has, to a greater or less extent, been made by State appointment. But these are more properly State than local officers. They perform duties for the State in localities, as collectors of internal revenue do for the general government; and a local authority for their appointment does not make them local officers, when the nature of their duties is essentially general.   *   *   *   The municipality, as an agent of government, is one thing; the corporation, as an owner of property, is in some particulars to be regarded in a very different light."

In *Board of Park Commissioners v. Common Council of Detroit*, 28 Mich. 228, 235, it is said:

"In *People v. Hurlbut*, 24 Mich. 44, we considered at some length the proposition which asserts the amplitude of legislative control over municipal corporations, and we there conceded that when confined, as it should be, to such corporations as agencies of the State in its government, the proposition is entirely sound. In all matters of general concern there is no local right to act independently of the State; and the local authorities cannot be permitted to determine for themselves whether they will contribute through taxation to the support of the State government, or assist when called upon to suppress insurrections, or aid in the enforcement of the police laws. Upon all such subjects the State may exercise compulsory authority, and may enforce the performance of local duties, either by employing local officers for the purpose, or through agents or officers of its own appointment. The same doctrine was declared in *People v. Mahaney*, 13 Mich. 481, and in *Bay City v.*

*State Treasurer*, 23 Id. 503. It was also recognized in the statement that in the levy of taxes for purposes of general concern the municipal bodies cannot demand a right to be consulted, and their consent is immaterial. And we concur fully in the views which have been expressed by other courts in the cases to which our attention was called on the argument, that, as regards duties which the people in the several localities owe to the commonwealth at large, they cannot be allowed a discretionary authority to perform them or not as they may choose. Such an authority would be wholly inconsistent with anything like regular or uniform government in the State."

It was held in *People v. Reilly*, 53 Mich. 260, that the act authorizing the appointment of jury commissioners for the recorder's court by the Governor was valid, and that the commissioners were not city officers, though acting within the locality. See, also, *People v. Hanrahan*, 75 Mich. 611; *Speed v. Common Council*, 100 Id. 92; *People v. Supervisors of Macomb Co.*, 3 Id. 475; *City of Wyandotte v. Drennan*, 46 Id. 478.

It is settled by these cases that, whenever the Legislature imposes the performance of a public duty upon a municipality, such municipality is then but an instrumentality of the State. In the discharge of such duties, there is no right of local self-government involved. It is true that municipal corporations in this State have certain proprietary rights, and as to these they are free from State interference, as is well illustrated in *People v. Hurlbut, supra*. But municipal corporations have also certain duties imposed upon them which are of a governmental character, and those duties are performed by the local corporate body, as agents for the State, and such duties may be enlarged or diminished at the will of the Legislature. The care of the public health is a police power. The several states of the Union possess a general police power, by which persons and property are subjected to all kinds of restraints and burdens in order to secure the general health, comfort, and prosperity of the state. Whatever differences of opinion

may exist as to the extent and boundaries of the police power, and however difficult it may be to render a satisfactory definition of it, there seems to be no doubt that it does extend to the protection of the lives, health, and property of the citizens, and to the preservation of good order and public morals. They belong emphatically to that class of objects which demand the application of the maxim, *"Salus populi suprema lex,"* and they are to be attained and provided for by such appropriate means as the legislature may devise. *People v. Phippin,* 70 Mich. 6; *Beer Co. v. Massachusetts,* 97 U. S. 32. Judge COOLEY says:

"The state may have its state board of health, but it will provide for local boards of health also; and, as their duties concern the community at large, their members are to be regarded as state, rather than local, officers." Cooley, Tax'n (2d ed.), 684.

In *Taylor v. Board of Health,* 31 Penn. St. 73, it is said:

"The board of health of Philadelphia is a public corporation of the state, charged with public functions for the benefit of the state at large, and not simply for local purposes."

3. It is said that the act is unconstitutional, in that it authorizes the board of health to require money to be raised by an annual tax for local purposes without the consent of any of the local officers or of the boards of said city. The preservation of the public health is not a local purpose, and the consent of the locality is not material, where the function is a public or general one. *People v. Mahaney,* 13 Mich. 481, 500.

4. It is next contended that the charter amendment was introduced after the first 50 days of the session, in violation of section 28, art. 4, of the Constitution. It appears that the bill was introduced on the fiftieth day, and therefore within the time limited by this clause of the Constitution. The amendment, however, was made in section 27 after the 50 days had expired. But the bill

is not in conflict with this provision of the Constitution for that reason. The added language is germane to the charter. The point is ruled by *Pack v. Barton*, 47 Mich. 520. In that case it appeared that a bill was introduced within the first 50 days for the organization of the township of Montmorency. It was, after the 50 days had elapsed, amended so as to make it a bill for the organization of the county of Montmorency. The territory embraced in the bill was the same. Mr. Justice COOLEY said:

"To attempt on this record to indicate the limits of constitutional power, in the amendment of bills previously introduced, would be uncalled for and therefore unwarranted. * * * No one disputes that whatever is within the proper scope of amendment is as much admissible after the 50 days as before, and this must embrace whatever is germane to the purpose which the bill had in view."

See, also, *Hart v. McElroy*, 72 Mich. 446, and cases cited.

5. The claim is made that the provision in section 27 of the amendment to the charter is void which directs the city treasurer to place to the credit of the board of health the sum of $12,000, for the maintenance of the board for the remainder of the fiscal year, etc., by transfer from any other funds in the city treasury, and the same to be paid out on the checks of the health board in the manner now provided by law for payment from the public health fund, and provides that the common council may replace the moneys so transferred by temporary loan, to be repaid from liquor taxes paid in to the credit of the contingent fund. It is contended that this provision is in violation of that portion of section 1, art. 14, of the Constitution of the United States, which reads:

"Nor shall any state deprive any person of life, liberty, or property without due process of law."

The funds were only to be transferred temporarily, and replaced by the moneys collected from the liquor

taxes. The municipality is not deprived of the money belonging to any particular fund. It is in the hands of the city treasurer, and we may take judicial notice of the fact that sufficient moneys will come into the hands of the treasurer from the liquor taxes to replace it. It is apparent from the act of February 27 that the Legislature regarded the inhabitants of the city of Detroit, and of the State at large, in imminent peril by reason of the then impending pestilence, and that funds were necessary to enable the board to prevent its spread. The Legislature had the right to impose the burden upon the city to defray the expense of the health board, and it cannot be said that the transfer of money from one fund to the other to pay a debt deprives the city of its property, within the meaning of the provisions of that section of the United States Constitution. It is apparent from the record before us that the city treasurer had sufficient funds on hand to make the transfer without detriment to the city, or to any objects to which those particular funds were appropriated, and the fund from which the moneys for the health board are to be taken is to be replenished by the moneys from the liquor taxes. The fund from this source is absolutely under the control of the Legislature. While the property which a municipal corporation acquires in the exercise of its corporate powers is protected from legislative interference as vested rights, yet in provisions of the law for the revenue of the city, whatever form such provision may take, the city has no vested right; and the Legislature may at any time, as far as the municipal corporation is concerned, change and modify, or altogether take away, the particular source of revenue. Tied. Mun. Corp. § 12.

Many and varied duties are imposed upon the health board under this act, but whether any of those duties are beyond the power of the Legislature to grant to it we need not now determine. The various objections to the acts which have been made we have carefully examined,

and find no reason for saying that the acts cannot be upheld.

The court below was correct in directing the *mandamus* to issue to the controller to sign the warrant for the moneys demanded. That action must be affirmed.

GRANT, MONTGOMERY, and HOOKER, JJ., concurred with LONG, J.

MCGRATH, C. J. (*dissenting*). The question involved in this case is of such vital moment that I cannot concur in the opinion of the majority, although my views may seem to conflict with cases in this Court involving a similar question. The vice of a doctrine becomes more apparent as its application is carried beyond the exigencies of the case which caused its evolution in the first instance. The doctrine was first announced by this Court in *People v. Mahaney*, 13 Mich. 481. The objections raised to the act in that case were (1) that the proposition to give the act immediate effect did not receive the necessary two-thirds vote; (2) that a subsequent act continued the respondent in office; (3) that the act violated section 20, art. 4, of the Constitution; (4) that it violated section 25, art. 4, of the Constitution; (5) that under the act there was no limit to the exactions of the board, whereas section 13, art. 15, of the Constitution required the Legislature to restrict the powers of taxation in cities; and (6) that the act violated the principle of no taxation without representation. The Court, after discussing the other objections raised, say:

"Besides the specific objections made to the act as opposed to the provisions of the Constitution, the counsel for respondent attacks it on general principles, and, especially, because violating fundamental principles of our system that governments exist by the consent of the governed, and that taxation and representation go together. The taxation, under the act, it is said, is really in the hands of a police board,—a body in the choice of which the people of Detroit have no voice. *  *  * It cannot, therefore, be said that the maxims referred to have been entirely disregarded by the Legislature in

the passage of this act. But as counsel does not claim that, in so far as they have been departed from, the Constitution has been violated, we cannot, with propriety, be asked to declare the act void on any such general objection. An unbroken series of decisions in this State has settled the rule of law that, before we can declare an act of the Legislature invalid, its provisions must be found to conflict with the Constitution."

Section 14, art. 15, of the Constitution was not referred to in the brief of counsel, nor was it alluded to in the opinion. Counsel did not claim that this section had been violated, and the Court expressly refrained from discussing a provision of the Constitution not pointed out or relied upon.

In *People v. Reilly*, 53 Mich. 260, a challenge was made to the array of jurors in a criminal case, upon the ground that they were selected by persons appointed by the Governor. Mr. Justice SHERWOOD, referring to this section, says:

"The commissioners appointed by the Governor are not 'judicial officers,' in the sense in which those words are used in this section; and, if they were, they are not city or village officers, but county appointees, and are therefore not within the provisions of the section referred to. The defendant, under the operation of the law, is in no way deprived of his common-law jury, nor of any of its essential incidents. The mode and manner of selecting the jury has always been a subject of statutory regulation; and so long as the mode adopted requires good and lawful men of the vicinage of defendant, to be taken from the body of the county, the respondent has no cause for complaint on constitutional grounds, and this is secured by the statute complained of."

Justices CHAMPLIN and COOLEY concurred in the result reached, and Mr. Justice CAMPBELL writes an opinion favoring the reversal of the judgment on other grounds.

In *People v. Hurlbut*, 24 Mich. 44, however, the Court was brought face to face with section 14, art. 15, of the Constitution, and it seems to me that the construction and effect given to that provision is utterly irreconcilable

with the doctrine of the Mahaney case.     Mr. Justice
CHRISTIANCY, in that case, does not refer to the doctrine
of *People v. Mahaney,* but, in discussing the provision in
question here, he refers to the use of the word "elected,"
"in reference to the local organization of counties, towns,
and districts," and says that, "cities and villages being
local organizations for like governmental purposes," it
is difficult to resist the conclusion that an election by
the electors of such localities was intended. Referring
then to the question as to appointments under the same
provision, he says:

".But when we recur to the history of the country, and
consider the nature of our institutions, and of the gov-
ernment provided for by this Constitution, the vital
importance which in all the states has so long been
attached to local municipal governments by the people
of such localities, and their rights of self-government,
as well as the general sentiment of hostility to every-
thing in the nature of control by a distant central power
in the mere administration of such local affairs, and ask
ourselves the question whether it was probably the inten-
tion of the convention in framing, or the people in adopt-
ing, the Constitution, to vest in the Legislature the
appointment of all local officers, or to authorize them to
vest it elsewhere than in some of the authorities of such
municipalities, and to be exercised without the consent,
and even in defiance of the wishes, of the proper officers,
who would be accountable rather to the central power
than to the people over whose interests they are to pre-
side, thus depriving the people of such localities of the
most essential benefits of self-government enjoyed by
other political divisions of the State,—when we take all
these matters into consideration, the conclusion becomes
very strong that nothing of this kind could have been
intended by the provision. And this conviction becomes
stronger when we consider the fact that this Constitu-
tion went far in advance of the old one, in giving power
to the people which had formerly been exercised by the
executive, and in vesting, or authorizing the Legislature
to vest, in municipal organizations a further power of
local legislation than had before been given to them.
We cannot, therefore, suppose it was intended to deprive
cities and villages of the like benefit of the principle of

local self-government enjoyed by other political divisions of the State. The convention must be supposed to have recognized, to some extent, existing things, and to have had reference to cities and villages with substantially such organizations, or upon such principles of self-government, as had generally become customary."

Chief Justice CAMPBELL says:

"Our Constitution cannot be understood or carried out at all, except on the theory of local self-government, and the intention to preserve it is quite apparent. In every case where provision is made by the Constitution itself for local officers, they are selected by local action. All counties, towns, and school-districts are made to depend upon it. All elections are required to be in local divisions where electors reside. Cities are represented in the board of supervisors, and it is quite possible for their members to outnumber the rest. It certainly cannot be that the State can control those bodies by sending its own agents there, and it cannot be possible that it was contemplated that any members of that board should be selected by a different mode of election or appointment from the rest. Cities may become counties, and surely there can be no county without popular institutions. Cities have been judicially declared to come within the denomination of 'townships,' so far as to be entitled to library money; and, unless they are made to include school-districts, they need not be compelled to have free schools. No one would venture to assume that the Constitution was designed to leave them in such a position. It is impossible to read that document without finding the plainest evidence that every part of the State is to be under some system of localized authority emanating from the people. This is no mere political theory, but appears in the Constitution as the foundation of all our polity. There is no middle ground. A city has no constitutional safeguards for its people, or it has the right to have all its officers appointed at home. Unless this power is exclusive, the State may manage all city affairs by its own functionaries. The only reasonable meaning of the constitutional clause in question is that, when the Legislature has designated the time and manner of appointment or election, the local authority shall fill the offices as so ordained."

Mr. Justice COOLEY, in the same case, says:

"The question, broadly and nakedly stated, can be nothing short of this: Whether local self-government in this State is or is not a mere privilege conceded by the Legislature in its discretion, and which may be withdrawn at any time at pleasure."

He then says:

"I can conceive of no argument in support of the legislative authority which will stop short of this plenary and sovereign right."

He then proceeds to the discussion of certain maxims of government relating to the creation and endowment of municipal bodies, their control, regulation, and abolishment, remarking, however, that—

"Such maxims of government are very seldom true in anything more than a general sense. They never are, and never can be, literally accepted in practice. Our Constitution assumes the existence of counties and townships, and evidently contemplates that the State shall continue to be subdivided as it has hitherto been. * * * It names certain officers which are to be chosen for these subdivisions, and confers upon the people the right to choose them."

Then, after discussing the amplitude of legislative power in the absence of restrictions, he says:

"The doctrine that, within any general grant of legislative power by the Constitution, there can be found authority thus to take from the people the management of their local concerns, and the choice, directly or indirectly, of their local officers, if practically asserted, would be somewhat startling to our people. * * *

"The State may mould local institutions according to its views of policy or expediency, but local government is matter of absolute right, and the State cannot take it away. It would be the boldest mockery to speak of a city as possessing municipal liberty where the State not only shaped its government, but, at discretion, sent in its own agents to administer it, or to call that system one of constitutional freedom under which it should be equally admissible to allow the people full control in

their local affairs, or no control at all. What I say here is with the utmost respect and deference to the legislative department, even though the task I am called upon to perform is to give reasons why a blow aimed at the foundation of our structure of liberty should be warded off. Nevertheless, when the State reaches out, and draws to itself and appropriates the powers which, from time immemorial, have been locally possessed and exercised, and introduces into its legislation the centralizing ideas of continental Europe, under which despotism, whether of monarch or commune, alone has flourished, we seem forced back upon, and compelled to take up and defend, the plainest and most primary axioms of free government, as if, even in Anglician liberty, which has been gained step by step through extorted charters and bills of rights, the punishment of kings and the overthrow of dynasties, nothing was settled and nothing established.

"But I think that, so far as is important to a decision of the case before us, there is an express recognition of the right of local authority by the Constitution. That instrument provides (art. 15, § 14) that 'judicial officers of cities and villages shall be elected, and all other officers shall be elected or appointed, at such time and in such manner as the Legislature may direct.' It is conceded that all elections must, under this section, be by the electors of the municipality. But it is to be observed that there is no express declaration to that effect to be found in the Constitution; and it may well be asked what there is to localize the elections any more than the appointments. The answer must be that in examining the whole instrument a general intent is found pervading it, which clearly indicates that these elections are to be by the local voters, and not by the Legislature, or by the people of a larger territory than that immediately concerned. I think, also, that, when the Constitution is examined in the light of previous and contemporaneous history, the like general intent requires, in language equally clear and imperative, that the choice of the other corporate officers shall be made in some form, either directly or indirectly, by the corporators themselves."

In *Allor v. Board of Auditors*, 43 Mich. 76, it was held that under our Constitution there cannot be any such thing as a municipal government which is not managed

by popular representatives and agencies deriving their authority from the inhabitants; that there can be no complete city corporation without means of enforcing such regulations as are necessary for the peace and good order of the community; that constables are local peace officers; that no legislation would be valid which retained the names, but destroyed the powers, of such officers; that, while there is an undoubted power to vary the duties of such officers, their duties could not be so changed as to practically change the office; that, when officers are named in the Constitution, they are named as having a known legal character; that the Metropolitan police force of Detroit, so far as lawfully constituted, is merely an additional force of constables and watchmen appointed by the State for certain limited purposes, and it cannot supersede the local peace officers for all common-law purposes.

In *Attorney General v. Detroit Common Council*, 58 Mich. 216, where the Legislature undertook to create a board of commissioners of registration and election for the city of Detroit, it is said:

"It is also well settled that our State polity recognizes and perpetuates local government through various classes of municipal bodies, whose essential character must be respected, as fixed by usage and recognition when the Constitution was adopted; and any legislation, for any purpose, which disregards any of the fundamental and essential requisites of such bodies, has always been regarded as invalid and unconstitutional."

In *Wilcox v. Paddock*, 65 Mich. 23, an act had been passed for the improvement of Maple river, in Clinton and Gratiot counties. It provided for the appointment by the probate court of Gratiot county of a commissioner, whose duty it was to examine the line of the proposed work, and if, in his opinion, it was necessary, and *for the good of the public health*, he should proceed with the work, and assess the cost thereof in excess of the appropriation upon the property benefited, and upon

any township, city, or village, *by reason of the benefit to the public health thereof.* In that case it is said:

"The whole theory of the Constitution, and of our State polity, before and since its adoption, looks to the imposition of local taxes for local purposes by local officers. By this act they are to be levied and expended by a person not a resident of the township or the county of which the persons assessed are inhabitants, and in which the work is done from which the benefits authorizing the taxes are presumed to arise. The authority of the commissioner, who is made the taxing officer, is derived from a court whose jurisdiction is foreign to, and independent of, the county of Clinton; and the board of review which makes such assessment a finality is composed of four members out of five as completely beyond the reach of the people taxed as if they lived in another state. The people of Essex, in Clinton county, therefore, by this act, are taxed by officers in whose election they have no voice, and whom they have no power to replace by others of their own choosing. This cannot be done."

In *Board of Metropolitan Police v. Board of Auditors,* 68 Mich. 576, it was held that the attempted extension of the powers of the police board to police certain townships adjacent to the city of Detroit was illegal. Again it is said by the Court that under our system we can have no governments, general or special, that do not immediately represent a popular constituency, and no properly called governmental power can be lodged anywhere else, and that the people cannot be subjected to any delegated powers of government not exercised by their own representatives. In referring to *People v. Mahaney,* the Court say that the act under consideration in that case was held sufficient to replace a city marshal by the officers substituted.

I am aware that in the Hurlbut case, and in some others, an attempt has been made to distinguish the Mahaney case. The basis for the distinction is that the Mahaney case related to a police force; that local municipalities have a two-fold character, the one public, and

the other private; and that in the matter of public order
the State has a special interest, and the police force
must be regarded as an agency of the State, rather than
of the city. It does seem to me that in the discussion
of the Mahaney case there has been an unwarranted
limitation as to the force and effect of the constitutional
provisions relating to local self-government, and that
the invocation of an implied power to sustain a legisla-
tive act which undertakes, in violation of constitutional
guaranties, to thrust upon a local municipality officers
in the selection of whom the inhabitants of that locality
have no choice, and make such officers a part of the per-
manent system of local government, is indefensible.
The question involved is not whether the State may not
provide for a State militia. It is not whether the State
does not possess certain police powers, or whether it may
not exercise those powers. The power to appoint a
State board of health, or an oil inspector, with his
deputies, is not brought in question. Nor is it contended
that the preservation of public order or of public health
is not a matter of State concern. The board of health of
the city of Detroit is a local board created primarily, at
least, in the interest of the locality,—existing because of
the existence of the local entity. The question is whether
these local officers may be appointed by the State, simply
because the board exercises a function in which the
State is incidentally interested. It seems to me very
clear that it is the exercise of governmental functions
by officers selected by the inhabitants of the municipality
that is guaranteed by the Constitution to the local entity,
and this without reference to whether the functions
relate to matters purely local in character, or matters
in which the public at large may have an incidental
interest. Local ordinances are, as a rule, closely related
to general laws. To attempt to confine the doctrine of
the Hurlbut case to such functionaries as are the mere
care-takers of municipal property is a narrow view to

take of the principle of local self-government. In that case, Mr. Justice Cooley, at page 106, says:

"What is constitutional freedom? Has the administration of equal laws by magistrates freely chosen no necessary place in it? Constitutional freedom certainly does not consist in exemption from governmental interference in the citizen's private affairs; in his being unmolested in his family, suffered to buy, sell, and enjoy property, and generally to seek happiness in his own way. All this might be permitted by the most arbitrary ruler, even though he allowed his subjects no degree of political liberty. The government of an oligarchy may be as just, as regardful of private rights, and as little burdensome as any other; but, if it were sought to establish such a government over our cities by law, it would hardly do to call upon a protesting people to show where in the Constitution the power to establish it was prohibited. It would be necessary, on the other hand, to point out to them where, and by what unguarded words, the power had been conferred. Some things are too plain to be written. If this charter of State government which we call a 'Constitution' were all there was of constitutional command; if the usages, the customs, the maxims, that have sprung from the habits of life, modes of thought, methods of trying facts by the neighborhood, and mutual responsibility in neighborhood interests, the precepts which have come from the revolutions which overturned tyrannies, the sentiments of manly independence and self-control which impelled our ancestors to summon the local community to redress local evils, instead of relying upon king or legislature at a distance to do so,—if a recognition of all these were to be stricken from the body of our constitutional law, a lifeless skeleton might remain. But the living spirit; that which gives it force and attraction, which makes it valuable, and draws to it the affections of the people; that which distinguishes it from the numberless constitutions, so called, which in Europe have been set up and thrown down within the last hundred years, many of which, in their expressions, have seemed equally fair, and to possess equal promise, with ours, and have only been wanting in the support and vitality which these alone can give, —this living and breathing spirit which supplies the

105 Mich.—10.

interpretation of the words of the written charter would be utterly lost and gone."

It may as well be asked, what is the theory of local self-government? Is it the mere privilege of providing water, light, and fire protection, and of paying for and owning the plant? Our Constitution not only secures to townships and counties the right of selection of the officers of those municipalities, but also the right to insist that those functionaries shall not be shorn of their functions; and this notwithstanding the fact that the list includes officers who have been termed "State officers," and others whose functions embrace matters of general as well as of local concern. These officers include the circuit judges, probate judges, justices of the peace, prosecuting attorneys, sheriffs, school inspectors, highway commissioners, and constables, all charged with important functions, including the administration of law, the arrest and prosecution for crime, and the preservation of order. It is not so much the officer as the exercise of the function that is guaranteed to the locality. In *Robertson v. Baxter*, 57 Mich. 127, it was held that the essential qualities of townships are fixed by recognition in the Constitution, and cannot be changed, and that public burdens cannot be laid, under the Constitution, except by persons chosen by the community in which the work is to be done. In *Hubbard v. Township Board of Springwells*, 25 Mich. 153, by Act No. 414, Laws of 1871, the Governor had been empowered to appoint commissioners to improve a highway; but the Court held that the powers of commissioners and overseers of highways were subject to legislative modification, but that no Legislature could abolish the offices, or take away all their functions. The difficulty that attended the determination of the Allor case, *supra*, was not that officers known by another name had undertaken to discharge the functions, but that the attempt had been made by the police officers, who had not been chosen by

the locality. There has not been for many years, in the city of Detroit, an officer known as a "supervisor," "commissioner of highways," or "overseer of highways;" but the functions of such officers have been discharged by other officers, and no one has ever questioned the right of substitution, or charged that the Constitution has been violated. A health board is, under our statutes, an organic incident of every township, city, or village in the State. In the Mahaney case it was held that the police officers were State officers, yet in the Allor case, *supra*, it was held that they could not supplant the constabulary; and in *Board of Metropolitan Police v. Board of Auditors, supra*, it was held that these officers could not police territory adjacent to the city of Detroit, and that the people of such territory could not be subjected to any delegated governmental powers not exercised by their own representatives. Why not, if the people of the city of Detroit can be so subjected? Constables and sheriffs are charged with the preservation of order, yet, in respect of the mode of their selection, the Constitution makes no distinction between these officers and township clerks or registers of deeds. The Legislature is authorized to organize counties as well as cities and villages, and boards of supervisors are empowered to organize townships. When organized, each derives its powers, as to the selection of its officers, from the Constitution, and not from the Legislature or the board of supervisors.

Section 14, art. 15, expressly provides that "judicial officers of cities and villages shall be elected, and all other officers shall be elected or appointed, at such time and in such manner as the Legislature may direct." By this provision the constitutional guaranties accorded to townships and counties, respecting the matter of local self-government, are extended to cities and villages. It seems to me very clear that the theory of the Constitution is to organize these local subdivisions as constituent governmental entities, to invest them with the

largest measure of function and responsibility, to bring representatives and constituency into close relations, and thus secure to the officer the largest measure of moral support in the discharge of his duties, and to the locality, being the most directly interested, and having the best means of information, the right of selection and rejection.    I am aware that officers may become derelict in the performance of their duties, but under the Constitution the Legislature may provide for the removal of any officer elected by a county, township, or school-district, and there is no doubt of the power to provide for the removal by the Governor of any officer of any municipality in the discharge of whose functions the State has a special interest.    The Constitution itself points out the remedy in such case.

But it may be said that a community may become incapable of self-government, and in one of the cases this language is used:

"The effect upon the whole State of abrogating local government in a single city or township, and leaving everything to disorder and to the unrestrained passions of bad men, would inevitably be pernicious, beyond estimate."    *Youngblood v. Sexton*, 32 Mich. 417.

Happily, such a contingency is a very remote one.    In *Attorney General v. Detroit Common Council*, 58 Mich. 213, 226, Mr. Justice MORSE says:

"The nearer the officers are to the people over whom they have control, the more easily and readily are reached the evils that result from political corruption, and the more speedy and certain the cure.    The form of our State government presupposes that the people of each locality, each municipal district or political unit, are intelligent and virtuous enough to be fully capable of self-government."

Conceding that there exists, by implication, the power to provide for such a contingency, it is but an emergency power, the exercise of which is sanctioned only by the emergency, and must then be provisional only.    It cer-

tainly was not intended that such power could be invoked to supplant our local governmental system, or that, with the help of a mere fiction, there could be ingrafted upon that system, as a permanent structural part thereof, a feature so utterly repugnant to the whole theory of local self-government.

I regard the doctrine of the Mahaney case as utterly inconsistent with the principles underlying the subsequent decisions of this Court, a few only of which have been referred to, and am of opinion that the case should not be regarded as authority upon the question raised here.